UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                              PLAINTIFF

v.                                    CRIMINAL ACTION NO. 3:10-CR-107-H

SHANION M. THURMAN
JAMES L. ROBINSON                                    DEFENDANTS

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
**AND RECOMMENDATION**

**FINDINGS OF FACT**

The District Court has referred to the Magistrate Judge pursuant to 28 U.S.C.

§636(b)(1)(A), pre-trial motions (DN 59).  All four involve a dispute over the admissibility

of certain recorded jailhouse telephone conversations and the anticipated testimony of a

confidential source (DN 36, 46, 48, 67).  The conversations are part of the Government's

prosecution against two Defendants, Shanion Thurman and James Robinson, who are charged by

indictment with aiding one another to use and attempt to use physical force or threats of force

against a potential witness, G.S., with the intent to delay or prevent his testimony against non-

defendant Ricky Kelly.

Ricky Kelly and another individual, Dion Neal, are charged by a separate, prior

federal indictment, *United States v. Kelly*, 3:11-CR-33-H, with the murder-for-hire of victim

Lajuante Jackson.  Proof for the Government at trial of the present case against Thurman and

Robinson is expected to be that G.S. had arranged through his attorney, Kate Holmes of the

Kentucky Dept. of Public Advocacy (DPA), to testify against Kelly concerning the Jackson

murder and two other murders in which Kelly is allegedly involved in return for early release

from state prison.  This arrangement was set out in a written confidential cooperation agreement

between G.S. and federal and state prosecutors in late March of 2010.  The confidential

agreement was mailed to the Oldham County DPA office of attorney Holmes on April 2, 2010.

At that time, Defendant Shanion Thurman was employed as an administrative assistant to

Holmes in the same office.  The Government maintains that Thurman consequently had access to

all of Holmes' client records including the confidential cooperation agreement of G.S.

   The Government will offer proof that during this time in April of 2010, Thurman

resided with co-defendant James L. Robinson in Louisville, Kentucky, at 525 Belgravia Ct., Apt.

4.  James Robinson, as it turns out, is a lifelong friend of Ricky Kelly.  The Government intends

to prove this friendship by the introduction of various recorded jailhouse phone conversations

involving Kelly and Robinson, as well as other recorded conversations involving Kelly and

certain non-parties that include his brother, Terrell "Cam" Gray, and friends Ladasha Downs,

Tonya Masden, Tiffany Roberts and Kalila Brooks.  This friendship in the Government's view

explains much of what occurred next in April of 2010.

   The Government asserts that within less than one week of the delivery of the

written confidential cooperation agreement to attorney Holmes' office, G.S. was violently

assaulted on April 7, 2010 at the Franklin County Jail where he had been relocated.  Four days

later, on April 11, Terrell Gray advised Kelly during a recorded jailhouse phone conversation

that an individual referred to by Gray as "Little G" was cooperating with "the Feds" or the

"homicide people about you."  (DN 67, Ex. 9).  This recorded conversation is but one of 16

jailhouse calls that the Government seeks to introduce against Robinson and Thurman at trial.

   Two more such recorded phone conversations occurred that evening between

2

Kelly and non-party Tiffany Roberts (DN 67, Ex. 10, 11).  During the first such call, at approximately 8 p.m., Kelly asked Roberts to use her computer to find out which state correctional facility housed G.S. (DN 67, Ex. 10).  Later at approximately 11:30 p.m., Kelly again called Roberts in another recorded phone conversation during which Roberts provided Kelly with a physical description of G.S., his criminal record, inmate numbers and presumed location (DN 67, Ex. 11).

The very next day, on April 12, Kelly and Defendant Robinson had a lengthy conversation (DN 67, Ex. 13).  During this exchange, Defendant Robinson, using guarded language, informed Kelly about the assault on G.S. several days earlier and about the written confidential cooperation agreement (*Id*.).  Robinson advised Kelly that G.S. had provided information about three alleged murders.  (*Id*. at 2).  He further told Kelly that "she ," co-defendant Thurman according to the Government's theory, had only given Robinson information about the cooperation of G.S., and not two other unnamed individuals who also allegedly were cooperating with law enforcement to testify about Kelly's involvement in seven other murders. (*Id*.).

During the same recorded conversation, Robinson also referred to a signed statement by G.S. involving Kelly (*Id*. at 3) and that Robinson had to get the information to Kelly through his brother (*Id*. at 4).  Robinson then promised during the recorded phone exchange that if he could get the paperwork on the other two cooperating informants, he would let Kelly know.  (*Id*. at 5).  Robinson assured Kelly that he had seen the paperwork and that G.S., a persistent felony offender, was to be released in five months to home incarceration and was to have visitation with his daughter in return for his cooperation against Kelly.  Robinson told

Kelly that these terms were "in black and white" and "I wasn't supposed to see it, but I seen it...." (DN 67, p. 6).

Robinson repeated that G.S. had been beaten up a week earlier after Robinson found out.  (*Id*. at 7).  Robinson assured Kelly that he would try to get "all the information" that he could about the other two suspected informants.  (*Id*. at 8).  The Government now seeks to introduce into evidence these recorded phone conversations, along with a number of others, to establish that Defendant Thurman  leaked the confidential cooperation agreement to Robinson, who in turn alerted Kelly and his brother, Terrell Gray, about the cooperation of G.S. in three homicide investigations involving Kelly, with the intent to prevent G.S. from testifying.

Because these recorded jailhouse phone calls caused law enforcement to become suspicious that Thurman had leaked the confidential cooperation agreement involving G.S., a sting operation was arranged using Louisville Metro Police Department (LMPD) homicide Sergeant Denny Butler.  The Government will offer proof at trial that Sgt. Butler contacted Thurman by telephone at attorney Holmes' office on July 22, 2010.  Butler advised Thurman during their conversation that he would be sending a letter to attorney Holmes by fax, and that the letter contained information about G.S. and his cooperation in the Kelly murder investigation.  By prior arrangement, Thurman was the only employee in the office during their conversation.  The letter, in fact, was merely a test to determine whether Thurman would leak the contents of the letter to Defendant Robinson or other unknown persons.

Subsequently, on July 25, 2010, Kelly contacted his brother Terrell Gray (DN 67, Ex. 14).  During their recorded phone conversation, Terrell advised Kelly that he wanted to show Kelly "this paper" about Greg.  (*Id*.).  Fifteen minutes later, Kelly again spoke with Terrell using

4

Tiffany Roberts as an intermediary to connect the two men (DN 67, Ex. 15).  Terrell at the outset

of their conversation read aloud the entire letter of Sgt. Butler to Kelly (*Id*. at 1-2).  Later that

same evening, Kelly and Robinson, again using Tiffany Roberts as an intermediary, spoke in a

recorded phone conversation.  During the exchange, Kelly asked Roberts to ask Defendant

Robinson if he had talked to Tanner (DN 67, Ex. 17).  Robinson advised Roberts, and she related

to Kelly, that Robinson had given Tanner a "piece of paper a couple of days ago"....  (*Id*. at 2).

The Government maintains that the "piece of paper" referred to in this conversation is Sgt.

Butler's July 22, 2010 letter to Kate Holmes.

Armed with this information from the recorded jailhouse phone calls, law

enforcement officials obtained a search warrant for Thurman and Robinson's Belgravia

apartment, as well as their separate automobiles.  On August 3, 2010, ATF agents executed the

search warrant.  The agents found in the glove box of Thurman's Lexus automobile a copy of

G.S.'s confidential cooperation agreement.  Later that same afternoon, a criminal complaint was

issued against Shanion Thurman for her alleged violation of 18 U.S.C. §§1512(a)(2)(A) & 2 for

aiding and abetting witness tampering (DN 1).  A separate criminal complaint was issued against

James Robinson the same day on the same charge of aiding and abetting witness tampering (DN

1).  An indictment against both individuals on these charges was returned approximately two

weeks later (DN 10).

The United States has moved the Court now to determine the admissibility of 16

recorded telephone conversations, or portions thereof, involving Ricky Kelly and the other

individuals identified above (DN 36, 46).  Defendants Robinson and Thurman have each filed a

response (DN 53, 54, 55).  The United States has filed a reply and addendum (DN 58, 60).  Oral

argument was initially held before the Magistrate Judge on December 22, 2011 (DN 65).[1]  On

order of the Magistrate Judge, the United States filed a supplemental motion to admit the

recorded calls, along with the testimony of a confidential source (C.S. 1) concerning a series of

statements made by Defendant Robinson to C.S. 1 while both men were housed in the Louisville

Metro Corrections Jail (DN 67).  Defendant Thurman and Robinson have filed responses to the

supplemental motion (DN 76, 77).  A second hearing was held on Monday, March 19, 2012 (DN

72)[2] with a third and final hearing held on April 9, 2012.[3]  Accordingly, the matter is now ripe

for consideration.

## CONCLUSIONS OF LAW

At issue are two types of evidence that the Government seeks to have admitted at

trial.  The first category of evidence includes some 16 recorded jailhouse phone calls, or portions

of calls, all of which involve Ricky Kelly.  The second category of evidence centers on the

anticipated testimony of a cooperating source, designated C.S. 1, who the Government will offer

at trial to testify about a series of incriminating statements made by James Robinson following

his arrest in August of 2010.  The Government has offered various theories under the Federal

Rules of Evidence to justify the admission of these two categories.  *See* Federal Rules of

Evidence (FRE) 402, 801(d)(2), 802, 804(b)(3) and 807.  Beyond questions of evidence, the

parties also address constitutional issues that arise from the confrontation clause of the Sixth

---

[1]  An official transcript of the hearing has been filed in the record (DN 74, 75).

[2]  An official transcript of the second hearing has been filed in the record (DN 80-81).

[3]  An official transcript of the third hearing has been filed in the record (DN 82).

Amendment as interpreted by *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) and its

progeny. *See, Melendez-Diaz v. Mass.*, __ U.S.__, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314

(2009); *Davis v. Washington*, 547 U.S. 813 (2006). Thus, the admission or the non-admission of

the disputed conversations presents complex challenges, not only of law and fact, but

organizational ones as well  given the sheer magnitude of the statements put at issue.

   The procedural posture of this dispute cannot be ignored either. Trial of the

charges against Robinson and Thurman is months away. No witnesses have been sworn or

testimony taken. The nature and the order of proof is far from resolved. At this point, it is not

known who will testify or who will refuse to do so, or be otherwise unavailable to testify. The

result is that this report cannot avoid reliance on certain assumptions about the nature of the

evidence at trial and the individuals that will testify or be unavailable to do so. To the extent that

matters at trial diverge materially from these assumptions, the result of the trial proceedings may

well deviate from the contents of this recommendation. With this caveat in mind, the Magistrate

Judge turns to the first group of statements that the Government discusses in its supplemental

motion to admit recorded calls (DN 67).[4]


a.  **Defendant Robinson's Own Statements**

   The first group of statements to be discussed are those statements that include the

---

[4] Throughout this report the various statements are organized by both exhibit number and corresponding alphabetical designation, as set forth in the Government's supplemental motion. Attached to that motion as exhibits 1-16 are the various statements in dispute. The Government in its supplemental motion, and Thurman and Robinson in their responses to the supplemental motion, also have alphabetically designated the same exhibits with letters "a" through "o." The Magistrate Judge shall use both identifiers when referring to any particular statement.

out-of-court statements of Defendant Robinson.  These statements may be found in exhibits 4, 5, 8A and 8B, 12 and 16, which are also identified by the corresponding letters "d", "e", "g", "k" and "o."  All of these disputed statements are recorded jailhouse conversations with nonparty Ricky Kelly.  It is presently anticipated that neither Defendant Robinson nor Kelly will testify at trial, but will elect to assert their individual Fifth Amendment privilege if called.  This initial group of statements also includes those out-of-court, post-arrest statements allegedly made by Defendant Robinson to C.S. 1, the earlier mentioned jailhouse informant, while the two men were incarcerated together at the Louisville Metro Corrections Jail.

The United States argues that Robinson's own out-of-court statements are not only relevant to the charged offense within the definition of FRE 401,[5] but also are not subject to exclusion under the general prohibition of the hearsay rule, FRE 802.[6]  Citing *United States v.*

---

[5]  Rule 401 provides:

> Evidence is relevant if:
> (a)      it has any tendency to make a fact more or less probable that it would be without the evidence; and
> (b)      the fact is of consequence in determining the action.

FRE 401 (2012).

[6]  Rule 802 provides:

> Hearsay is not admissible unless any of the following provides otherwise:
> •      A federal statute;
> •      These rules; or
> •      Other rules prescribed by the Supreme Court.

FRE 802 (2012).

8

*Matlock*, 514 U.S. 164, 172 n.8 (1974) and FRE 801(d)(2)(A),[7] the Government maintains that Defendant Robinson's own statements are not hearsay when offered against him at trial.  Instead, they fall within the category formerly known as "admissions by a party opponent," which is now referred to under the cited rule as being "an opposing party's statement."  Because Defendant Robinson is a party opponent to the Government in its prosecution of him and his co-defendant Thurman, the United States concludes that the admission at trial of all of Defendant Thurman's statements to Ricky Kelly or to C.S. 1 is entirely proper and does not run afoul of the prohibition against the admission of hearsay evidence under FRE 802.

As the Sixth Circuit explained in *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005),

> Not all out-of-court statements qualify as hearsay, however.   For instance, Federal Rule of Evidence 801(d)(2) excludes admissions by a party-opponent (which are offered against the party) from the definition of hearsay because the adversarial process allows the party-declarant to rebut his or her own admissions by testifying at trial.  See, Fed.R.Evid. 802 (d)(2) & Advisory Committee's Notes ("Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.")

---

[7] Rule 801(d)(2)(A) provides:

> (d)   **Statements that are not hearsay.**  A statement that meets the following conditions is not hearsay:
> ....
> (2)   **An opposing party's statement**.  The statement is offered against an opposing party and:
> (A) was made by the party in an individual or representative capacity.

FRE 801 (2012).

9

*Id*.

Admission of a party opponent's statement under FRE 801(d)(2)(A) is not dependent on whether the challenged out-of-court statement is inculpatory or exculpatory. *McDaniel*, 398 F.3d at 545 (citing *United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir.), *cert. denied*, 510 U.S. 904 (1993) ("On its face, Rule 801(d)(2) does not limit an admission to a statement against interest.  Furthermore, this court has refused to place such a limited construction on the scope of an admission.")).  *See also, United States v. Slone*, 833 F.2d 595, 601 (6th Cir. 1987) (exculpatory grand jury testimony given by defendant was admissible under Rule 801(d)(2)).

All that is required for a party opponent's out-of-court statement to be admitted under FRE 801(d)(2)(A) is that the statement "include some specific fact which tends to establish guilt or some element of the offense." *Turner*, 995 F.2d at 1363 (citing *Slone*, 833 F.2d at 601.  Indeed, the primary reason for the amendment of FRE 801(d)(2) in 2011, to replace the term "admissions" with the term "statements" was due to the fact that "the term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense - - a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made."  30B Michael H. Graham, *Federal Practice & Procedure, Evidence*, Chap. 9B (Thomson 2011).  Any contrary interpretation of FRE 801(d)(2) that would attempt to distinguish between exculpatory and inculpatory out-of-court statements by a party opponent would merely confuse the distinctions between FRE 801(d)(2) with FRE 804(b)(3), which creates an exception to the rule against hearsay for statements against interest made by an

10

unavailable declarant.[8]

The application of FRE 801(d)(2)(A) is not unbounded, however.  The rule may only be used to support the admission of an out-of-court statement when such statement is offered against that party.  *See, Stalboski v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000) ("Under Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party."); *see also, United States v. Maliszewski*, 161 F.3d 992, 1008 (6th Cir. 1998), *cert. denied*; *Villareal v. United States*, 525 U.S. 1183 (1999) (Rule 801(d)(2)(A) could not be relied upon to introduce the statement of a former defendant who had pled guilty and was no longer a party at the time of trial).

With the above principles of evidence law in mind, the Court now turns to examine each of the out-of-court statements of Defendant Robinson to determine whether they satisfy the requirements of Rule 801(d)(2)(A), or if the nature of the statements implicates any

---

[8] Rule 804(b)(3) provides that if a declarant is unavailable as a witness, his or her statement against interest is not excluded by the rule against hearsay.  The rule continues to define a statement against interest as follows:

> (3)    **Statement against interest**.  A statement that:
> (A)    a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interests or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
> (B)    is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

FRE 804(b)(3) (2012).

additional rule of evidence or constitutional concerns.

**Exhibits 4 and 5**

The first statements of Defendant Robinson that the Government seeks to introduce via FRE 801(d)(2)(A) are found at exhibits 4 and 5, which are alphabetically designated and referred to by the parties in their motion papers as "d."  These two exhibits are excerpts of a recorded phone conversation that occurred on Jan. 28, 2010, during a collect phone call from Ricky Kelly at the Green River Correctional Complex (GRCC) to James Robinson at 7:39 p.m. (DN 67, Ex. 4, 5).

During the first conversation between the two men, contained in exhibit 4, Robinson complains to Kelly that "Gene" keeps contacting him (DN 67, Ex. 4, pp. 1-2).  Kelly advises Robinson during this conversation that "the homies" believe that Robinson has access to or possession of Kelly's property such as money and automobiles (DN 67, Ex. 5, p.1).  Kelly complains further that law enforcement agencies, referred to as "the alphabet boys," believe that he has money and property hidden (DN 67, Ex. 5, p. 2).  During their conversation, Robinson assures Kelly that Kelly is the only person that Robinson will "mess with."  (DN 67, Ex. 4, p. 2).  The two men then discuss whether Kelly still has a building on 42nd Street (DN 67, Ex. 4, p. 3).  Kelly acknowledges that he still has the building and advises Robinson that he has denied, when asked by "Tanner," that he gave any property or money to "Jim."  (Id. at 4).  Near the conclusion of the first excerpt of their conversation, Robinson affirms to Kelly that Kelly is his best friend since Robinson was five years old and that he has no others (DN 67, Ex. 4, p. 4).

The Court first finds that the substance of exhibits 4 and 5, designed "d," are

clearly relevant to the alleged charge of attempt to tamper with potential witness G.S. under FRE 401.  The statements of Robinson establish a deep, lifelong relationship between the two men, a relationship that apparently began when Robinson was no more than five years old.  The depth of this relationship is further confirmed by Robinson's statement denying that he has any other such friends as Kelly.  Such a lifelong, close relationship is offered by the Government to explain why Robinson would put himself at risk to obtain sensitive information such as the confidential cooperation agreement and would immediately convey that information to Kelly.  Absent the introduction of such evidence at trial, the Government would have no explanation for the jury as to why Robinson did what he allegedly did in April of 2010.  *See gen., United States v. Roe*, 670 F.2d 956, 971 (11th Cir. 1982), *cert. denied*, 459 U.S. 856 (1982) (motive of defrauded investors to invest in corporation was relevant to establish their reliance on the misrepresentations by corporate officers); *United States v. Talavera*, 668 F.2d 625, 630-31 (1st Cir. 1982), *cert. denied*, *Pena v. United States*, 556 U.S. 978 (1982) (evidence of heroin transaction involving one co-defendant, where both were charged only with separate cocaine transaction, was admissible to establish the close relationship between the two defendants).

Both Defendant Robinson and Defendant Thurman argue repeatedly with respect to various out-of-court statements that implicate their respective interests that any minimal probative value of such out-of-court statements as those detailed above is far outweighed under FRE 403 by the unfairly prejudicial nature of the challenged statements.  The Defendants maintain that the challenged statements are being used by the Government simply to interject the presence of Ricky Kelly at trial due to his alleged involvement in numerous drug-related murders such as the one involving Lajuante Jackson, now prosecuted in *United States v. Kelly*, 3:11-CR-

13

33-H.  In fact, Thurman argues that Kelly, who is not anticipated to testify at trial, is the invisible "2000 pound gorilla" in the courtroom.  (DN 77, p. 19).  Robinson and Thurman maintain that the jury simply will not be able to separate any alleged involvement of Kelly in various murders from the far less serious witness tampering charge prosecuted against them.

It is now well settled that "even relevant evidence may constitutionally be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"  *Alley v. Bell*, 307 F.3d 380, 396 (6th Cir. 2002) (quoting *Sanders v. Freeman*, 221 F.3d 846, 859 (6th Cir. 2000) (quoting FRE 403)).  Evidence which may be admissible under one rule of the Rules of Evidence, *i.e.*, Rule 404(b), must still be shown to have a "probative value" that is "not substantially outweighed by the danger of unfair prejudice under Rule 403."  *United States v. Dunn*, 805 F.2d 1275, 1280 (6th Cir. 1986).  Thus, merely because the content of exhibits 4 and 5 may be relevant within the meaning of FRE 401, the trial court could yet exclude them in the exercise of its discretion under FRE 403 if they are found to be unduly prejudicial.  *See, United States v. Gallo*, 763 F.2d 1504, 1525 n.32 (6th Cir. 1985) ("Clearly in reviewing Rule 403 decisions we must apply an 'abuse of discretion' standard.").  *See also, United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985) ("The admission or exclusion of evidence under Rule 403 is within the sound discretion of the trial court.") (admitting into evidence a conversation that referred to possible future criminal activity was not an abuse of discretion where the conversation was evidence of motive, scheme and intent).

Here, the Government would be hard pressed to bring a prosecution without some mention of Kelly and introduction of the challenged conversations between Robinson and Kelly.

The gravamen of the case is that due to Robinson's lifelong friendship with Kelly, and his access to confidential documents through his girlfriend, Thurman, he obtained the confidential cooperation agreement of a potential witness against Kelly, G.S., and conveyed such information to Kelly in an effort to thwart the ability of G.S. to provide testimony against Kelly. Kelly, by definition, therefore must be included in the Government's proof at trial.

To what extent the Government may dwell upon Kelly and any allegations of Kelly's own criminal activity, including alleged homicides, is a matter that simply cannot be resolved until the trial. In other words, were the Government to attempt to introduce into evidence significant details related to the alleged murders by Kelly, including the murder of Lajuante Jackson, then the trial court in the sound exercise of its discretion, might at some point cut short the Government's efforts. Certainly, no such efforts have been made to date, nor do any of the out-of-court statements sought to be introduced pursuant to FRE 801(d)(2)(A) involve any explicit discussion of Kelly's own alleged criminal activity, other than perhaps Kelly's ongoing, vague denials of any such involvement. Nonetheless, given the intended testimony of G.S. against Kelly in Case No. 3:11-CR-33-H, repeated references to Kelly, and Kelly's own statements in the recorded conversations involving Robinson are unavoidable and, more importantly, not presently excludable under Rule 403.

A helpful Sixth Circuit decision that involves Rule 801(b)(2)(A) is *United States v. Henderson*, 626 F.3d 326, 337 (6th Cir. 2010). In *Henderson*, an Ohio defendant was charged with the murder of two witnesses in retaliation for their providing information and/or testimony that led to the defendant's earlier conviction for bank robbery. *Henderson*, 626 F.3d at 331. At trial on the murder charges, the United States introduced prior out-of-court statements of both of

15

the deceased victims, along with certain recorded prison telephone conversations involving the defendant, Thomas Henderson, and members of his family, after a finding by the trial court that the prior statements of the deceased witnesses, Bass and Washington, were admissible non-testimonial statements under *Crawford v. Washington*, 541 U.S. 36 (2004).

The court then turned its focus on the defendant's claim of ineffective assistance of trial counsel based on the failure of trial counsel to object to the introduction of the recorded prison phone calls.  During these conversations, the defendant discussed with his family attempts by him to influence witnesses in the murder case, along with his feelings about the death of the two victims.  *Henderson*, 626 F.3d at 337.  The Sixth Circuit concluded that the failure of trial counsel to object to the introduction of the statements was not a deficient performance under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  In so holding, the court explained:

> Counsel's failure to object was not deficient because any hearsay objection would have been overruled.  The statements made by Henderson during the conversations were non-hearsay admissions under Federal Rule of Evidence 801(b)(2)(A) and the statements made by others were not admitted to show the truth of the matters asserted, but to prove the context for Henderson's admissions.

*Id*. at 337 (citing *United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004)); *United States v. Davis*, 170 F.3d 617, 627 (6th Cir. 1999).

The same is true with respect to exhibits 4 and 5.  The out-of-court statements of Defendant Robinson and the responses of non-party Kelly are both relevant and admissible under the rules of evidence cited above.  Such statements do not appear to be unduly prejudicial at this point based on the anticipated nature of the proof to be offered at trial.

The sole question remaining with regard to exhibits 4 and 5, designated "d" by the parties, is whether introduction of such out-of-court statements raises constitutional issues

16

under the confrontation clause of the Sixth Amendment.  Both Robinson and Thurman question

whether the recorded jailhouse conversations are "testimonial" under the standard of *Crawford*.

*See gen., Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221(2012).  If so, they cannot be

introduced at trial by the Government when the declarant is unavailable unless the Defendant

had a prior opportunity for cross-examination.  *Crawford*, 541 U.S. at 53-54.  *See, United States*

*v. Johnson*, 581 F.3d 320, 323-28 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 3409 (2010) (discussing

*Crawford*). The United States argues in response that the nature of the statements made by Kelly

and Robinson, informal phone conversations that occurred between close friends, simply are not

the type of statements that fall with the "core class of testimonial statements" first mentioned in

*Crawford*, 541 U.S. at 51-52.

   Unfortunately, the *Crawford* decision did not craft a specific definition of what

type of statement is a "testimonial statement" for the purpose of the confrontation clause.[9]  *Id*. at

51-52.  The decision instead provides certain non-exhaustive examples of the core class, which

the Court held includes (1) *ex parte*, in-court testimony or its functional equivalent, (2) extra-

judicial statements contained in formalized testimonial materials (affidavits, depositions, prior

testimony or confessions) and (3) statements made under such circumstances as would lead an

objective witness to reasonably believe that the statement would be available for use later at trial.

*Id. See, Miller v. Stovall*, 608 F.3d 913, 923 (6th Cir. ), *petition for cert. filed* 79 U.S.L.W. 3404

(2010) (discussing *Crawford*).

   Robinson and Thurman seize on the third and final category of statements to

---

[9] The most recent decision of the U.S. Supreme Court on the confrontation clause, *Williams v. Illinois*, ___U.S.___, 132 S.Ct. 2221, 183 L.E.2d 89 (2012) does not resolve the issue either.

support their argument of the testimonial nature of the recorded jailhouse calls that the Government seeks to introduce against them.  Both Defendants point out that all of the individuals involved in these phone calls were well aware that the jailhouse calls were being recorded and that other individuals potentially would be listening to them.  This awareness directly led to Kelly and the others speaking in coded language that included street slang and incomplete sentences as a means to prevent those listening in from deciphering the true meaning of the conversation.

      Obviously, to Robinson and Thurman, this type of conduct clearly indicates that the speakers held a reasonable belief that their statements might be available for use against them or others later at trial.  The Government in response cites several federal district court decisions, which hold that such casual, recorded jailhouse conversations are non-testimonial in nature.  *See, Malone v. Kramer*,  2010 WL 1404286 at *17 (E.D. Cal. Apr. 6, 2010), *aff'd*, __ Fed.Appx.___, 2011 WL 4842550 (9th Cir. Oct. 13, 2011), *cert. denied*, __ S.Ct.__, 2012 WL 603128 (U.S. Feb. 27, 2012) (recorded jailhouse conversations between defendant truck driver charged with murder and his wife were "more closely akin to the 'offhand, overheard remark' statements identified in *Crawford* as not implicating the core concerns of the confrontation clause"); *Ibarra v. McDonald*, 2011 WL 1585559 at *5 (N.D. Cal. Apr. 26, 2011) (recorded jailhouse phone calls between incarcerated victim of drive-by shooting and the alleged perpetrator fell closer to the "offhand, overheard remark" statements identified in *Crawford* as not implicating the confrontation clause even though the recorded phone calls began with an announcement that the

call was subject to monitoring and recording).[10]

The Sixth Circuit has provided guidance on this question in *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). To quote from *Cromer*:

> The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

*Id*. The *Cromer* test has been consistently applied in the Sixth Circuit since its inception. *See, Miller v. Stovall*, 608 F.3d 913, 924 (6th Cir. 2010) (citing *United States v. Mooneyhan*, 473 F.3d 280, 286-87 (6th Cir. 2007).

Here, the nature of the statements made by Robinson and Kelly during their jailhouse telephone calls does not appear to the Court to indicate that either declarant intended to bear testimony against the other. It is highly doubtful that either Robinson or Kelly would anticipate that his statements would be used against the other in the investigation of a specific crime. Certainly, both men were well aware that their conversations were recorded, and could be intercepted by law enforcement officers. This general awareness, however, as noted in *Ibarra*, does not translate into an intent to bear testimony against the accused within the meaning of *Cromer*. Rather, all of the conversations contained in exhibits 1-16 seem far more in the nature

---

[10] For other decisions that involve questions of constitutionality arising in the context of the admission of recorded jailhouse telephone conversations, *see United States v. Hicks*, 575 F.3d 130, 143-44 (1st Cir. 2009), *cert. denied*, 130 S.Ct. 647, 175 L.Ed.2d 495 (2009) (statements made by unavailable witness in response to the defendant's own statements were unquestionably admitted to prove the context for the defendant's statements and were not admitted for the truth of the matter asserted so as to implicate the confrontation clause); *United States v. Hadley*, 431 F.3d 484, 509-10 (6th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006) (trial court properly admitted audiotape recording and transcript of phone call made by defendant from the county jail to his wife while awaiting trial).

of the type of casual, offhand remarks made between friends that routinely are held to be non-testimonial in nature.  Because these statements are non-testimonial, out-of-court statements, their admissibility is only subject to review under the Federal Rules of Evidence and implicates no confrontation clause concerns.  *United States v. Arnold*, 486 F.3d 177, 192-93 (6th Cir. 2007) (*en banc*), *cert. denied*, 552 U.S. 1103 (2008) (discussing *Davis v. Washington*, 547 U.S. 813, 825 (2006) and *Whorton v. Bockting*, 549 U.S. 406, 420 (2007)).

   The former test of *Ohio v. Roberts*, 448 U.S. 56 (1980) likewise is not applied to a non-testimonial, out-of-court statement.  *United States v. Johnson*, 581 F.3d at 325 (*Johnson II*) (citing *Arnold*, 486 F.3d at 192-93).  Because confrontation clause concerns do not apply to non-testimonial, out-of-court statements, the need to analyze the admissibility of such tape recorded phone calls under the rule established in *Bruton v. United States*, 391 U.S. 123, 137 (1968) is eliminated as well.  *Id.* (citing *United States v. Pugh*, 273 Fed.Appx. 449, 455 (6th Cir. 2008) ("The statement at issue ... is non-testimonial in nature, and therefore, does not implicate the confrontation clause as analyzed under *Bruton* or otherwise.").  Accordingly, because all of the recorded jailhouse phone calls appear to be non-testimonial under *Crawford* and *Cromer*, no confrontation clause issues are implicated thereby.[11]

---

[11]  Aside from the nontestimonial nature of the statements at issue, their admission does not invoke the fundamental concerns of the Confrontation Clause because Robinson's statements are his own nonhearsay admissions under FRE 801(d)(2)(A) and Kelly's statements are not offered for the truth of the matter asserted.  *See United States v. Walter,* 434 F.3d 30, 33-34 (1st Cir. 2006), *cert denied,* 547 U.S. 1199 (2006); *United States v. Tolliver,* 454 F.3d 660, 665 (7th Cir. 2006), *cert denied, Dunklin v. United States,* 549 U.S. 1149 (2007); *United States v. Boykins,* 380 Fed. Appx. 930, ** 3 (11th Cir. 2010). *See gen., United States v. Inadi,* 475 U.S. 387, 398 n. 11 (1986)(citing  *Tennessee v. Street,* 471 U.S. 409, 414 (1985)).  The Magistrate Judge nonetheless has addressed the nontestimonial nature of the recorded jailhouse telephone conversations at the outset of the recommendation as the issue pervades the arguments of the parties.

**Exhibit 6**

The next out-of-court statement is a Jan. 28, 2010 recorded phone call by Ricky Kelly from GRCC to Defendant Robinson (DN 67, Ex. 6). The exhibit is designated as "e" by the parties in their supplemental briefs. In this instance, Defendant Robinson identifies himself to Kelly and provides Kelly with a home address for his residence on 42nd Street (DN 67, Ex. 6, p. 1). Robinson also offers the comment that if Kelly had moved to Atlanta when Robinson had urged him to do so, Kelly would have been "straight." Kelly in response acknowledges that he would have been "rich by now." (*Id.*).

Once again, the Court concludes that the statements of Defendant Robinson, in particular his identification and contact information, are relevant to the Government's case against him. The out-of-court statement removes any significant doubt whom Kelly is dealing with, Defendant James Robinson. It likewise reaffirms Robinson's connection to Atlanta, which is a reoccurring theme in several of the recorded jailhouse calls. The Government intends to seek admission of these calls to not only identify Robinson, but to show that references to "Jimmy" and "my dude in Atlanta" refer to Robinson and demonstrate the level of trust that Kelly placed in Robinson to safeguard Kelly's property in Atlanta.

No barrier to admissibility of this conversation exists under Rule 401. Likewise, as matters presently stand, no unfair prejudice is imposed on Robinson so as to render the statement excludable under Rule 403 in the discretion of the District Court. As the Court noted above, Kelly's involvement in the phone calls, and his mention at trial, is unavoidable given the nature of the charges. Finally, because the conversation consists merely of offhand, casual comments between close friends in an informal setting, the out-of-court statements are both non-

hearsay and non-testimonial and therefor do not implicate the Confrontation Clause.

**Exhibits 8A and 8B**

The next two exhibits, 8A and 8B, are designated as "g" by the parties.  Both of these exhibits involve a single phone call made by Ricky Kelly from GRCC to Defendant Robinson at 5:42 p.m. on Feb. 8, 2010 (DN 67, Exhibits 8A and 8B).  During the initial portion of the call, Robinson advises Kelly that he has "somebody looking at" Kelly's records.  After Kelly tells Robinson that Robinson should have his lawyer get in contact with Kelly, because Kelly still has "pull" at the DA's office, Robinson responds that he is going to tell Kelly something that Kelly must keep to himself (DN 67, Ex. 8A, p. 2).  Robinson then proceeds to tell Kelly that "the chick waiting on you man" has an older sister who is a lawyer and is Robinson's girlfriend.  (DN 67, Ex. 8A, p. 2).  Robinson then advises Kelly that his girlfriend had "done looked up your case already, so you just need to tell me or write it to me what exactly you want me to do or have her do ... we'll go from there, but she's already looked up your record."  (DN 67, Ex. 8, p. 2).

The conversation then continues in Ex. 8B during which Robinson tells Kelly that his girlfriend is Shanion rather than Sam, who is the younger sister of Kalila Brooks, an individual whose identity is established in yet another phone conversation with Kelly (DN 67, Ex. 8B, p. 1).  Robinson explains to Kelly that Kalila Brooks does not know that her older sister is assisting him with investigating Kelly's criminal records (*Id.*).  Robinson advises Kelly to "keep that under wrapper, dog, so we can do what we gotta do."  (*Id.*).

The initial question, as always, is whether the above information is relevant

within FRE 401. The answer, once again, is clearly that the identity and involvement of Shanion Thurman in obtaining information on behalf of Kelly is the very heart of the Government's case. The Government's theory is that Thurman at Robinson's request obtained G.S.'s confidential cooperation agreement in early April, which Robinson then provided to both Kelly and Kelly's brother, Terrell Gray, in an effort to help his lifelong friend by hindering the prospect that G.S. would testify against Kelly. The importance of this information to the charged offense of witness tampering is simply beyond dispute, nor can it be persuasively argued that the unfair prejudicial value of such information outweighs its probative worth. The information is highly probative and is not unfairly prejudicial to the extent that it merely identifies Thurman as being Robinson's girlfriend, who is attempting to help out Kelly.

The problem for the Government with this information, however, is that it is not admissible against Thurman pursuant to FRE 801(d)(2)(A) which, as earlier noted, is limited in its application to the declarant, Defendant Robinson. *Stalbowsky*, 205 F.3d at 894 ("Under Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party."); *Maliszwki*, 161 F.3d at 108 (same). The United States therefore cannot rely upon this particular rule to introduce Robinson's statements against Thurman, a fact that the Government itself recognizes in its supplemental memorandum by its reference to Rule 807, the residuary hearsay exclusion rule "as to statements made by Robinson which implicate co-defendant, Thurman." (DN 67, p. 4).

Rather than address Rule 807 at this juncture, the Court elects to return to exhibits 8A and 8B in the section of this report that deals with the residual hearsay exception of Rule 807. At this juncture, the Court does conclude that, to the extent exhibits 8A and 8B reflect a

23

conversation between Defendant Robinson and Kelly that is to be admitted against Robinson, then Rule 801(d)(2)(A) governs the analysis and the out-of-court statements of Robinson are non-hearsay statements, not subject to Confrontation Clause analysis given their non-hearsay and non-testimonial nature. *See, United States v. Walter,* 434 F.3d at 33-34; *United States v. Gibbs*, 506 F.3d 479, 486-87 (6th Cir. 2007); *Cromer*, 389 F.3d at 670-71; *Mooneyhan*, 473 F.3d at 286-87.

**Exhibit 12**

The fourth recorded conversation excerpt between Defendant Robinson and Kelly is transcribed in exhibit 12, designated as "k" by the parties. This jailhouse call by Kelly to Robinson occurred from GRCC at 11:52 a.m. on April 12, 2010 (DN 67, Ex. 12). During the conversation, Robinson and Kelly discussed who the informant may be. Robinson advises Kelly that the informant got "f-d up" a few days earlier last week, approximately a month after the confidential cooperation agreement, or "paperwork" was executed. (DN 67, Ex. 12, p. 2). Robinson speculates that perhaps someone else found out about G.S.'s cooperation and adds that two other individuals may be cooperating with the Government, as well. (DN 67, Ex. 12, p. 2). Robinson tells Kelly that G.S. is expected to say that Kelly was involved in three murders. (*Id.)* He adds that "she" did not give him any information about the other two suspected informants against Kelly, adding that "she" wasn't really supposed to get Robinson the information about G.S, (*Id.*), but "she knows you...." (*Id.*).

Robinson then continues in the conversation to advise Kelly that he has seen a signed statement by G.S. that implicates Kelly in the murders, as well as "P.," a possible

24

reference to Kelly's other brother, Antwan "Pearl" Tolley (*Id*. at 3).  Robinson, after reassuring

Kelly that he is Kelly's "brother," then continues to tell Kelly that he needed to get the

information to him, but had to go through his brother because "some heat shot down my way."

(*Id*. at 4).  As for the two other possible cooperating informants, Robinson complains that he

could not get the paperwork on them, but if he does he will let Kelly know (*Id*. at 5).

Robinson then returns to discussing what he has learned about G.S.  He assures

Kelly that he has "seen the paper" and that G.S. is a persistent felon, a "three strikes" prisoner,

who in return for his cooperation against Kelly and Kelly's brother Tolley, has been promised

home incarceration to begin in five months and visitation with his daughter.  (DN 67, Ex. 12, p.

6).  Robinson reassures Kelly that Robinson knows what he is saying and has seen the agreement

"in black and white," although he wasn't supposed to see it.  (*Id*.).  Once again, Robinson

advises Kelly that Robinson does not know if G.S. will survive, because he was severely beaten

up a week ago.  (*Id*. at 7).

Robinson tells Kelly, however, that he does not know where G.S. is incarcerated,

but could find out.  (*Id*. at 7).  Kelly responds that he already knows where G.S. is located and

that he knows whom Robinson is talking about.  (*Id*. at 8).  Kelly repeats that there are supposed

to be two other individuals, beyond G. S., who also are cooperating.  (*Id*. at 8).  He then assures

Kelly that he will "get all the information I can get...."  (*Id*. at 8).  Robinson reminds Kelly that

Kelly is his "peeps" and expresses remorse for his involvement in a prior incident that involved

giving Kelly "that G."  (*Id*. at 11).  Robinson explains to Kelly that he has felt guilty about the

incident and that it still bothers him now.  (*Id*. at 11-12).  Kelly concludes that when he gets out

of prison he will come see Robinson on "day one."  (*Id*. at 12).

25

As before, the Government seeks to admit Robinson's statements against him pursuant to Rule 801(d)(2)(A) as non-hearsay statements by an opposing party.  The Court has previously discussed the requirements of the rule, as well as the requirement that the anticipated statement be relevant to the charged offense under Rule 401, and that its probative value outweigh any potentially unfair prejudice under Rule 403.  The Court reaches the same conclusions with respect to Robinson and exhibit 12 that it did above.

Obviously, the quoted portions of the excerpts from the exhibit run directly to the Government's case against Robinson.  His comments reveal his review of and awareness about the contents of the confidential cooperation agreement, as well as his knowledge of the prior beating of the cooperating informant G.S. during the week prior to Robinson's conversation on April 12, 2010.  The conversation also confirms Robinson's ongoing willingness to assist Kelly by attempting to determine who the other two alleged cooperating individuals are.  Robinson reaffirms his close relationship with Kelly, and expresses his remorse over a prior incident involving Kelly in which Robinson apparently led Kelly astray, a fact relevant to Robinson's motivation to "make things right" by helping his close friend deal with the possibility of a cooperating witness who may testify against him.

The conversation shows that Robinson is fully aware of all of the confidential details of the cooperating agreement with G.S., including the provisions for home incarceration and visitation with G.S.'s daughter.  Robinson promises to attempt to gather more information on other potential cooperating individuals and the two men reaffirm the closeness of their relationship, with Kelly promising to come visit Robinson on the first day that he is released from prison.

All of these facts are relevant and material.  They explain why Robinson would act as he did in obtaining confidential information for Kelly's benefit.  They confirm that he did so, that he had intimate knowledge of otherwise highly confidential aspects of G.S.'s cooperation agreement that he shared with Kelly and his willingness to continue to attempt to obtain further information for Kelly.  Nothing in these facts is unfairly prejudicial to Robinson in any respect.  Accordingly, Rules 401 and 403 are not implicated by the admission of the statements contained in the conversation excerpts of exhibit 12, designated "k" by the parties.

The problem, as the Government recognizes, is the use of Robinson's statements against his co-defendant, Shanion Thurman.  The Government argues that as to Thurman the statements of Robinson, which cannot be introduced against her pursuant to FRE 801(d)(2)(A), are nonetheless admissible as a statement against interest under FRE 804(b)(3). Rather than separately analyze this particular rule, the Court shall reserve its discussion of FRE 804(b)(3) for a separate section of the report that deals directly with those statements the United States intends to introduce against Thurman at trial, all of which for the most part are included within the statements of co-defendant Robinson.

**Exhibit 16**

The final recorded conversation excerpt of the jailhouse calls that the United States seeks to introduce is contained in exhibit 16, designated as "o" by the parties.  This phone call occurred from the Louisville Metro Corrections facility on July 25, 2010, at 10:56 p.m.  Ricky Kelly using an intermediary, Tiffany Roberts, contacted Robinson at home.  During the conversation, Kelly asked Roberts to inquire whether Robinson had talked to "Tanner," or

"Montana" and had told him anything (DN 67, Ex. 16, p. 2).  Robinson responded to Roberts

that he gave Tanner "a piece of paper a couple of days ago ...." (*Id.*).  Roberts then relayed this

information to Kelly.  The conversation between Roberts and Kelly at the outset of the phone

call, before Roberts connected to Kelly, also identifies Robinson's house phone number (DN 67,

Ex. 16, p. 1).

       The Government now seeks to admit this conversation pursuant to Rule

801(d)(2)(A).  The Government's theory is that the "piece of paper" referred to by Robinson and

communicated to Kelly through Roberts is the July 22, 2010 letter of Sgt. Butler faxed to

Shanion Thurman at the DPA Oldham County office of attorney Kate Holmes.  If so, the

statements of Robinson would tend to show, in the Government's view, that the letter of Sgt.

Butler had been shared by Thurman with Robinson, who in turn had shared it with other

individuals, as demonstrated by a separate recorded conversation excerpt of the same day

involving Kelly's brother, Terrell Gray, during which Gray read the entire contents of Sgt.

Butler's letter to Kelly (DN 67, Ex. 15).  For these reasons, the Government argues that exhibit

16 is relevant and admissible without violation of the prohibition against hearsay evidence under

Rule 802.

       The Court agrees that the information contained in the conversation is relevant

within the meaning of Rule 401 for the reasons set forth by the Government.  It is highly relevant

whether Thurman obtained and released Sgt. Butler's letter to Robinson, who in turn shared it

with other individuals.  This information again runs directly to the charges of aiding and abetting

attempted witness tampering under 18 U.S.C. §1512(a)(2)(A) and 2.  The statement, likewise, is

not unfairly prejudicial under  Rule 403, but merely is supportive of the Government's theory of

events.  Merely because a statement may have an inculpatory interpretation does not make such

statement *unfairly* prejudicial.  *See, United States v. Hans*, 684 F.2d 343, 346 (6th Cir. 1982) ("A

rule 403 exclusion is appropriate only where the probative value of the relevant evidence is

substantially outweighed by the danger of unfair prejudice.") (citing *United States v. Brady*, 595

F.2d 359, 361 (6th Cir. 1979), *cert. denied*, 442 U.S. 862 (1979)).

One problem remains to be overcome before the Government may successfully

move to introduce the conversation excerpt contained in exhibit 16.  The problem involves the

potential admission of hearsay with hearsay in violation of FRE 805.[12]  Under Rule 805, "in

order to admit an out-of-court statement that is nested within another, Rule 805 requires that *both*

statements be admissible."  *United States v. Payne*, 437 F.3d 540, 547 (6th Cir. 2006), *cert.*

*denied*, 547 U.S. 1217 (2006) (citing *United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005)

(No violation of Rule 805 where the statements of both declarants were subject to admission

under Rule 801(d)(2)(A)).  *See also, United States v. Demjanjuk*, 367 F.3d 623, 631 (6th Cir.

2004), *cert. denied*, 543 U.S. 970 (2004).

Here, the Government indicates in its supplemental motion that it will sidestep the

double hearsay issue by presenting "a witness who will testify to Robinson's statements."  (DN

67, p. 7).  Presumably the individual most likely to have personal knowledge of such statements

is Tiffany Roberts, although the Government does not disclose the identity of its potential

---

[12]  Rule 805 of the Federal Rules of Evidence provides:

Hearsay within hearsay is not excluded by the rule against hearsay
if each part of the combined statements conforms with an
exception to the rule.

FRE 805 (2012).

witness on this point.  If Roberts does testify to the statements of Robinson, then the double

hearsay problem is avoided as Roberts herself is available for examination and cross-

examination as to Robinson's statements as related by her to Kelly.  Robinson's statements

themselves remain admissible under Rule 801(d)(2)(A).  No confrontation clause issue exists for

the same two reasons explained above with respect to all of the other 801(d)(2)(A) out-of-court

statements previously identified.


**Statements Made to C. S. 1**

Following his arrest in August of 2010, Robinson was housed at the Louisville

Metro Corrections facility.  During his incarceration there, Robinson allegedly spoke with a

"friend of a friend" now referred to the Government as C.S. 1.  According to the United States,

Robinson essentially told C.S. 1 everything about his involvement with Thurman, her access to

the confidential cooperation agreement of "Little G," who had agreed to provide evidence

against Kelly.  Robinson allegedly told C.S. 1 that his girlfriend, whom Robinson did not

identify by name in the conversation, had given the confidential cooperation agreement to him.

Robinson told C.S. 1 that no one knew he was Kelly's friend and that he was holding property

for Kelly in Atlanta while protecting that property from other individuals who were trying to

obtain it during Kelly's incarceration.

Robinson confided to C.S. 1 that he had provided the information concerning the

confidential cooperation agreement to Kelly's brother, Terrell Gray, also known by his street

name "Cogi."  Robinson supposedly told C.S. 1 that "they" had put a hit out on "Little G" as a

result of the information obtained about his cooperation against Kelly, and that "they" were

definitely out to get "Little G."  Robinson told C.S. 1 that he got into trouble with the law because he told Kelly about Little G's cooperation during a series of jailhouse phone calls. Finally, Robinson allegedly told C.S. 1 that the police were looking for an individual known by the street name "Montana" whom according to Robinson was referred to as "Tanner" in the recorded jailhouse conversations in order to mislead the police.

      The Government now argues once again that Robinson's statements to C.S. 1, whom the Government intends to call to testify at trial, fall outside the scope of Rule 802 and its prohibition against hearsay testimony as being the statement of a party opponent under Rule 801(d)(2)(A).  Once again, as to Robinson, the Court is compelled to agree.  Robinson's statements, or "admissions" to use the former terminology under the rule, are not considered to be hearsay.  Further, because they were made in the context of an informal conversation with an individual not know to be cooperating with law enforcement, such statements are non-testimonial.  The confrontation clause, therefore, does not apply, given that C.S. 1 is available and will testify at trial, and the statements themselves are not testimonial hearsay subject to *Crawford*.

      However, the question of the use of these statements against co-defendant Thurman is a valid one.  Rule 801(d)(2)(A) does not apply to Thurman, as the Court has previously noted.  The Government argues that nevertheless, Robinson's out-of-court statements to C.S. 1 may still be introduced against Thurman pursuant to Rule 804(b)(3) as a statement against interest.  The Court in keeping with its prior practice defers consideration of Rule 804(b)(3) until it separately addresses those statements intended to be introduced against Thurman by the prosecution.

No question exists in the Court's mind that Robinson's statements to C.S. 1 are admissible against Robinson under Rule 801(d)(2)(A). The statements are those of a party opponent and therefore non-hearsay. They clearly are material as they relate to almost all of the material information contained in the prior recorded jailhouse conversation excerpts. No unfair prejudice under Rule 403 runs to Robinson, who certainly is free to argue that C.S. 1 lacks credibility given his own status as a prisoner and the convenient and belated nature of his testimony, as claimed by the Defendants. As noted, no Confrontation Clause issues exist as Robinson's statements are non-testimonial and C.S. 1 apparently will be available for cross-examination at trial, according to the Government. The statements of Robinson to C.S.1 accordingly are not precluded from admission against Robinson either by constitutional or evidentiary law.

**b.     Non-Hearsay Statements under Rule 801(c)**

The United States next argues in its supplemental motion that the out-of-court statements contained in exhibits 2, 9, 10, 11, 14 and 15, designated as "b," "h," "i," " j," "m" and "n," are admissible at trial because such statements are not submitted for the truth of the matters contained therein and therefore are non-hearsay under Rule 801(c).[13] The Government argues as

---

[13]   Rule 801 provides:

> (c) **Hearsay**.  "Hearsay" means a statement that:
>> (1) the declarant does not make while testifying at the current trial or hearing; and
>> (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Federal Rule of Evidence 801(c)(2012).

to these recorded jailhouse conversations that it intends to introduce them at trial, not to prove

the truth of their contents, but rather simply to show that the statements themselves were made.

*See, United States v. Rodriguez-Lopez*, 565 F.3d 312, (6th Cir. 2009) (citing *Blair v. Henry*

*Filers, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).  *See also, United States v. Branham*, 97 F.3d 835,

851 (6th Cir. 1996) (an out-of-court statement offered to show its effect on the listener is not

hearsay).  Because the above identified statements allegedly are not being offered for the truth of

their contents and do not constitute hearsay, the Government continues to argue that the

admission of these statements at trial will not violate the Sixth Amendment rights of Robinson

and Thurman under the Confrontation Clause.  *Crawford*, 541 U.S.  at 59 n. 9 (when an out-of-

court statement is not offered to prove the truth of the matter asserted, the confrontation clause is

not implicated).  Accordingly, the fundamental question now is whether the identified out-of-

court statements are truly being offered not for the truth of their contents.

      As noted, "the hearsay rule bans in-court repetition of extra-judicial utterances

only when they are offered to prove the truth or falsity of their contents."  *United States v.*

*Gibson*, 675 F.2d 825, 834 (6th Cir. 1982), *cert. denied*, 459 U.S. 972 (1982) (citing *United*

*States v. Miriana*, 422 F.2d 150, 153 (6th Cir.), *cert denied*, 399 U.S. 910 (1970) (the rule does

not apply to statements offered merely to show that they were made)).  Thus, for example, if an

out-of-court statement is offered merely to establish the recipient's belief or state of mind as a

result of the utterance, then the extra-judicial statement is not hearsay under Rule 801.  *Id*. (citing

*United States v. Herrera*, 600 F.2d 502 (5th Cir. 1979)).

      Likewise, if the challenged extra-judicial statement is admitted not to establish the

truth of its contents, but rather to establish their "operative effect regardless of the meaning the

declarant intended them to have," then no violation of the prohibition against hearsay has

occurred under Rule 801(c).  *See, United States v. Vinson*, 606 F.2d 149, 155 (6th Cir. 1979),

*cert. denied*, 444 U.S. 1074 (1980) (admission of alleged bribery envelopes bearing the name of

the defendant sherif did not violate the prohibition against hearsay where the envelopes were not

introduced to establish a true statement of fact but rather to explain a past event in the form of

the investigating agent's preparation and delivery of the envelopes).

   Extra-judicial statements admitted not for the truth of their contents, but rather to

establish "background" information as an explanation for the Government's investigation, also

have been held by the Sixth Circuit to be admissible under Rule 801(c).  *See, United States v.

Deitz*, 577 F.3d 672, 683-84 (6th Cir. 2009), *cert. denied*, 130  S.Ct. 1720 (2010) (Officer's

testimony admissible to the extent that it merely 'alluded to' the confidential informant's

statement for background purposes of 'explaining how certain events came to pass or why the

officers took the actions they did' in searching the residence identified by the informant.) (citing

*Cromer*, 389 F.3d at 676).  *See also, United States v. Davis*, 577 F.3d 660, 666-68 (6th Cir. 2009)

("[T]he woman's statement could be admitted because it was being offered not to prove the truth

of the matter asserted, but to aid in understanding the officer's subsequent actions.") (citing

*United States v. Martin*, 897 F.2d, 1368, 1371 (6th Cir. 1990) ("In some circumstances, out-of-

court statements offered for the limited purpose of explaining why a government investigation

was undertaken had been determined not to be hearsay.")

   Further, it should be noted that if the extra-judicial statements at issue were either

questions or commands, absent proof that the challenged statements were code for something

else, they cannot be considered assertive speech subject to exclusion under Rule 802, as they do

not assert a proposition that can be true or false. *Rodriguez-Lopez*, 565 F.3d at 314-15 (citing *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) ("A question is typically not hearsay because it does not assert the truth of falsity of a fact.")).

**Exhibit 2**

The first recorded conversation excerpt is a phone call from Ricky Kelly to Defendant Robinson from GRCC on Jan. 26, 2010, at 11:49 a.m., designated "b" by the parties. During the call, Kelly tells Robinson to put some money on his cell phone so that Kelly will be able to call him collect from prison (DN 67, Ex. 2).  Clearly, this exchange is not hearsay under Rule 801(c).  The reason once again relates to the nature of a statement.  A command or a question, as noted above, is not considered to be a statement - - an assertion of fact - - subject to the proscription of Rules 801(c) and 802.

When Kelly ordered Robinson to put more money on his telephone, Kelly was not making a statement, but rather had given a command.  As a result, such command cannot be hearsay.  The only question is whether it is relevant, and if so, does its probative value outweigh any possibility of unfair prejudice.  The Court concludes that the exchange is relevant to the Government's case as it runs to the ability of Kelly and Robinson to communicate with one another.  No unfair prejudice, or any prejudice for that matter, flows from the statement, which is neutral in its nature, particularly given the existence of the other existing phone calls between Robinson and Kelly that the Court has already discussed in this report and recommendation.

**Exhibit 9**

35

The second conversation contained in Exhibit 9 and designated "h" by the parties involves a phone call by Ricky Kelly from GRCC to Terrell Gray at 7:48 p.m. on April 11, 2010 (DN 67, Ex. 9).  During the call, Terrell asks Kelly if he has talked to "Jim."  (*Id*. at 1).  Gray then advises Kelly that Jim "just hit me with some bullshit rap."  (*Id*.).  He then proceeds to tell Kelly that a younger black male, "Little G,"  is "running it" and that Little G had been sitting down talking (*Id*. at 2).  The two men then discuss who Little G is. (*Id*.).  Gray explains that he is the one "that supposed to be coming in and talking to the feds, or ... the homicide people about you...."  (*Id*. at 3).

The Government claims that except for the reference that "Jim hit him with some bullshit rap," the recorded jailhouse call excerpt is not offered by the Government to prove the truth of any of the other statements made during the conversation, but rather is offered instead only to show that the statements were made and the effect on the speakers.  (DN 67, p. 11).  The Government apparently hopes to show that Kelly and his associates became aware in early April of 2010, of G.S.'s cooperation after his confidential cooperation agreement was allegedly leaked and the effects such knowledge had upon them.  (*Id*. at 11-12).

The Government asserts that this information is relevant to show the impact of the disclosure on Terrell Gray and his brother Ricky Kelly, who upon receiving the information immediately attempts to find out the whereabouts of G.S.  The Government maintains that the relevancy of this information far outweighs any potential prejudicial impact or confusion to the jury under Rule 403.  It asks the Court to exercise its broad discretion in this respect, and if necessary, to provide the jury with a limiting instruction on the proper use of the evidence to mitigate the potential for any harm to the Defendants.  *See, United States v. Myers*, 123 F.ed 350,

363-64 (6th Cir. 1997).

Upon consideration, the Court agrees that the conversation excerpts of exhibit 9, excluding Gray's comment "man he just hit me with some bullshit rap," may be introduced at trial as non-hearsay evidence apart from the truth of their contents.  Gray's remaining statements to Kelly reflect that Gray has come upon otherwise confidential information that he has related to his brother.  Whether this information is true or not, the significance is that Gray has acquired it and communicated it - - facts which would indirectly support the disclosure of the information by Defendant Robinson, as he related in a separate recorded jailhouse conversation with Kelly.  In other words, the very existence of Gray's statements, apart from their truth, is relevant and material to the Government's case.  Also, Gray's statements are necessary background information to explain the remaining exchanges between Kelly and Robinson, Terrell Gray and Tiffany Roberts.

Without this essential background information, the jury cannot understand the remaining events as they unfolded, particularly Kelly's subsequent efforts to confirm the identity and obtain the location of G.S. and Robinson's own out-of-court statements concerning the details of the confidential cooperation agreement, which the Court previously has determined to be admissible under Rule 801(d)(2)(A) as statements by a party opponent.  *See, United States v. Davis*, 577 F.3d 660, 666-68 (6th Cir. 2009) (admitting into evidence the extra-judicial statement of an anonymous tipster to "help render understandable what might otherwise make no obvious sense to the jury.") (citing *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004)).  Accordingly, the Court agrees with the Government that exhibit 9, designated "h", is admissible, not for the truth of its contents, but rather to (1) show that Terrell Gray had obtained information

about a possible cooperating informant, irrespective of whether such informant existed, and (2) establish the context of the subsequent phone conversations between Defendant Robinson and Kelly, without which the jury would be hard pressed to make sense of Robinson's own fully admissible extra-judicial statements to Kelly.[14]  Defendant may address any potential prejudice they believe will result from admission of exhibit 9 by way of request for a cautionary instruction at trial on the proper use of the evidence.

**Exhibits 10 and 11**

The next exhibit, exhibit 10, designated "i" by the parties, is an excerpt of a recorded jailhouse phone conversation made from GRCC between Ricky Kelly and Tiffany Roberts on April 11, 2010, at 8:12 p.m. (DN 67, Ex. 10).  In this conversation, Kelly directs Roberts to go on her computer and determine the location of G.S. (*Id*. at 1).  Roberts advises Kelly that she is at her mother's home, where she has access to a computer.  Kelly tells Roberts that a "dude was talking to me about him" and that G.S. is "saying this shit about me...."  (*Id* at 2).  Kelly then continues in the conversation to provide a general description of G.S. and his current charges of confinement.  (*Id*.).

In the second recorded jailhouse call, which occurred at 9:37 p.m. on the same evening, Kelly again calls Tiffany Roberts (DN 67, Ex. 11).  In exhibit 11, designated "j" by the parties, Roberts advises Kelly of G.S.'s age, appearance, physical features, current charges of

---

[14]  For example, in one of Robinson's recorded jailhouse calls with Kelly, he makes reference to contacting Terrell Gray with the information about the cooperation agreement. Admission of exhibit 9 provides the background for this subsequent statement by Robinson concerning Gray.

conviction, parole history and inmate number (DN 67, Ex. 11, pp. 2-3). The Government

maintains that it does not seek to introduce either jailhouse conversation contained in "i" or "j"

for the truth of its contents, but rather is simply offering the extra-judicial statements of exhibits

10 and 11 to show that the statements were made and the effect on the speakers, as they

"demonstrate an awareness among Kelly's associates in April 2010, after G.S.'s confidential

cooperation agreement is leaked, and the effect that information has on Kelly when it is

disclosed to him." (DN 67, p. 11-12).

      The Defendants insist that these statements, along with all of the other exhibits

that the Government hopes to introduce as non-hearsay outside the definition of Rule 801(c) are

being offered directly for the truth of their contents, rather than for any legitimate non-hearsay

purpose.  On this point, Defendants observe that Kelly's mental state is not an element of the

offense charged.  Kelly is a non-party.  His mental state consequently is completely irrelevant to

the charged witness tampering offense at trial.

      The Court agrees to the extent that Kelly's mind set is not in any respect an

element of proof that the Government must establish in order to make its case on the charge of

witness tampering.  That being said, the reaction of Kelly and his associates to the information

obtained, apart from the truth of that information, is relevant in a larger sense.  The

Government's theory, once again, is that Robinson persuaded Thurman to obtain information

useful to Kelly, including the confidential cooperation agreement involving G.S., due to

Robinson's lifelong friendship with Kelly, and perhaps Robinson's own guilt over an earlier

incident that had negative consequences for Kelly.  Robinson, upon obtaining such information

from  Thurman, passed it along to Kelly with the hope that it would be used to prevent or hinder

G.S. from incriminating Kelly in the three murders apparently discussed by G.S. in his statement to federal law enforcement officials.

Consequently, Kelly's responses to the information from Robinson and others are in integral part of the Government's case. They explain why Robinson passed along the information, apart from whether such information was accurate or truthful. Further, as earlier mentioned by the Court, the jury simply will be unable to understand Robinson's own extra-judicial statements to Kelly admitted under Rule 801(d)(2)(A) without this vital background information. Robinson and Kelly subsequently discuss the location of G.S., with Kelly advising that he has already learned the prison location of G.S.

These two conversations, contained in exhibits 10 and 11 provide vital background information as to how Kelly came upon the supposed location of G.S. Whether Tiffany Roberts accurately identified that location (which she apparently did not) or whether she correctly recited G.S.'s prison number and criminal history is not important as the statements are not submitted for the accuracy of this information or its truthfulness. They simply provide the background information that permits the jury to place the remaining calls in context while providing an explanation for why Defendant Robinson passed along his knowledge concerning the confidential cooperation of G.S.

The Court additionally notes as to exhibit 10, designated "i", that the definition of hearsay under Rule 801(c) does not appear to apply to the extent that the conversation involves simply a command, or direction, by Kelly to Roberts to obtain information about G.S. As noted earlier, commands and questions do not fall within the definition of hearsay as they are excluded from being statements subject to the rule. *See, Rodriguez-Lopez*, 565 F.3d at 314-315 ("[I]f the

statements were questions or commands, they could not - - absent some indication that the statements were actually code for something else - - be offered for their truth because they would not be assertive speech at all.  They would not assert a proposition that could be true or false.") (citing *Wright*, 343 F.3d at 865).

   The Court additionally notes that Defendants could hardly complain of any unfair prejudice from the admission of exhibits 10 and 11.  To the contrary, these particular extra-judicial statements cut against the Government's case as they show that on April 11, four days after G.S. was beaten at the Franklin County Jail, Kelly and his associates did not even know where G.S. was located-- a fact confirmed by a subsequent conversation between Kelly and Robinson, during which Robinson offers to attempt to find out where G.S. is housed, and Kelly responds that he already knows.  Consequently, Defendants Thurman and Robinson may well potentially benefit from the admission of these statements as they directly play into the position of the defense that the two Defendants simply had nothing to do with the beating that G.S. received on April 7.

   While the Government argues that it need not connect that beating to either Defendant in order to prevail at trial, the timing of events nonetheless is a matter that on its face presents problems for the Government's case.  Therefore, little harm and perhaps some benefit may flow to the Defendants from the introduction at trial of exhibits 10 and 11.  Whether that is so, the Court remains convinced that both of these exhibits are offered not for the proof their contents, but rather to provide a necessary background and context for the recorded conversations between Robinson and Kelly, as well as to show Kelly's response to the information as an explanation for why Defendant Robinson would pass such information along

with the hope that Kelly might benefit thereby.

**Exhibits 14 and 15**

The next portion of the Government's supplemental motion for admission involves two phone calls by Kelly from the Louisville Metro Corrections facility, exhibits 14 and 15, designed "m" and "n."  These exhibits involved two phone calls that occurred on July 25, 2010 (Dn 67, Exs. 14 and 15).  The first call occurred at 10:24 p.m. and involves Ricky Kelly, his brother Terrell Gray, and an unknown male voice (DN 67, Ex. 14).  The second call, which occurred 15 minutes later at 10:39, involves Kelly, Tiffany Roberts and Terrell Gray (DN 67, Ex. 15).  During the first conversation between Kelly and Gray at 8:24 p.m., Gray advises Kelly that he has something, a paper about Greg, that he wants to read to Kelly (DN 67, Ex. 14).  Fifteen minutes later, Terrell Gray in the second of the two recorded conversations, then proceeds to read in its entirety the letter prepared by LMPD Sgt. Butler that was faxed to attorney Kate Holmes' office three days earlier on July 22, 2010, as part of a sting operation to determine if Shanion Thurman was providing confidential information to James Robinson and other individuals associated with Kelly (DN 67, Ex. 15, pp. 1-2).  During the same call, Gray advises Kelly that "Tanner" knows something else (DN 67, Ex. 15, p. 3).

Once again, the Government's position is that it seeks to introduce exhibits 14 and 15, designated "m" and "n," not for the truth of their contents, but rather to establish that the July 22 letter of Sgt. Butler, which had been faxed to the office where Shanion Thurman worked, ended up in the hands of Kelly's brother Terrell Gray.  The reference to the unknown individual "Tanner" as having additional information, presumably about the letter, is offered as

background, or foundation evidence for a subsequent call at approximately 11 p.m. on July 25, from Ricky Kelly to Tiffany Roberts, who acts as an intermediary between Robinson and Kelly. During this call Robinson advises Kelly through Roberts that Robinson gave some paperwork to "Tanner" a few days earlier (DN 67, Ex. 16 (designated "o")).

        Defendants in keeping with their position on this matter insist that the Government fully intends to offer all of these statements for the truth of the matters contained therein, rather than for non-hearsay purposes.  They insist that all of the statements contained in "b," "h," "i," "j," "m" and "n" imply the truth of the matters asserted therein and therefore simply cannot qualify as being admissible, non-hearsay, but rather are extra-judicial statements offered to prove the facts of the Government's case - - that G.S. was talking to police about Kelly, that he was housed at a specific prison, that Kelly wanted to know where he was housed and found out, and that Terrell Gray did receive paperwork about Greg that he read to Kelly - - all of which is highly prejudicial to the Defendants' case at trial.  Therefore, while the content of Sgt. Butler's July 22 letter may not be significant, Defendant Robinson argues that the truth of these statements allegedly made by Terrell Gray to Kelly is significant and therefore excludable hearsay inadmissible under Rule 802.

        The Court continues to believe that these extra-judicial statements, such as exhibits 14 and 15, are non-hearsay background information, without which the clearly admissible statements of Defendant Robinson under Rule 801(d)(2)(A) could not be placed in context for the jury.  In this specific instance, the reasoning for admission of these exhibits is even stronger.  They, apart from the substance of their content, are significant because the speech itself, particularly with regard to exhibit 15, has independent significance.  In other words, the

mere fact that Terrell Gray was in a position to say anything about Sgt. Butler's July 22 letter, apart from the truthfulness of the letter's contents, is significant and material to the Government's case.

Terrell Gray would have had no knowledge of the existence of the letter, but for the arguable inference that Shanion Thurman, upon receipt of the letter on July 22, passed it along to James Robinson, who shared it with Terrell Gray. Gray's conversation three days later on July 25, about the letter, therefore has independent evidentiary relevance completely apart from the contents of the letter itself. Exhibit 14 likewise is important from a foundational aspect as it sets the context for the subsequent reading of the letter 15 minutes later. Without this background, the jury is left without any understanding of the "paper" that came into Gray's possession. The same reasoning applies to the reference to "Tanner" in exhibit 15, as it sets the background for admissible references to Tanner in Defendant Robinson's subsequent conversations with Kelly. For these reasons, the Court concludes that exhibits 14 and 15 should not be excluded by the prohibition against hearsay under Rule 802, as they do not fall within the definition of hearsay contained in Rule 801(c) as being a statement by an unavailable declarant submitted for the truth of its contents.

**c.      Residual Hearsay Exception of Rule 807.**

The United States argues in this section of its supplemental motion (DN 67, pp. 13-22) that the recorded jailhouse conversations identified in exhibit 1, 3, 4, 5, 7, 8A and 8B and 9, respectively designated "a", "c ," "d ," "f," "g," "h" and "l" are admissible at trial against the

Defendants under the residual hearsay exception incorporated in Rule 807.[15]  Rule 807 is the

successor to former Rules 803(24) and 804(b)(5) of the Federal Rules of Evidence, which were

combined to create Rule 807 in 1997.  See 7 Michael H. Graham, *Handbook of Federal*

*Evidence*, § 701:1 (7th Ed. 2011).  The rule was created to provide the federal courts with the

flexibility required to accomplish the purposes of Rule 102 such as to encourage the

development of the law of evidence.  *Id.*

      The Advisory Committee's Notes to prior Rule 803(24) explain that FRE 803(24)

and 804(b)(5), now FRE 807, did not "contemplate an unfettered exercise of judicial discretion,

but ... do provide for treating new and presently unanticipated situations which demonstrate a

trustworthiness within the spirit of the specifically stated exceptions."  Advisory Committee's

Note to former Rule 803(24).  *See, United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977)

---

[15]  Rule 807 provides:

> (a) **In general**, under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by hearsay exception in Rule 803 or 804;
>> (1) the statement has equivalent substantial guarantees of trustworthiness;
>> (2) it is offered as evidence of a material fact;
>> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>> (4) admitting it will best serve the purposes of these rules and the interest of justice.
> (b) **Notice**.  The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Fed.R.Evid. 407 (2012).

(discussing a purpose of former Rule 803(24)).  Nevertheless, the federal courts have on several occasions cautioned that Rule 807 is in substance an exception of last resort to be applied in extraordinary circumstances lest it subsume the general prohibition against the admission of hearsay evidence under Rule 802.  *See, United States v. Laster*, 258 F.3d 525, 529-30 (6th Cir. 2001), *cert. denied*, 534 U.S. 1151 (2002) (If a hearsay statement is otherwise admissible under one of the exceptions of Rule 803, then the applicable subsection of that rule should be relied upon instead of the residual exception.); *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F. Supp.2d 777, 779 (E.D. Mich. 2011) ("The courts have cautioned that Rule 807 should be 'narrowly construed,' lest it 'become the exception that swallows the hearsay rule.'") (citing *Akradawi v. Carnes Co.*, 152 F.3d 688, 697 (7th Cir. 1998)).

Perhaps the clearest warning that Rule 807 is to be cautiously applied comes from the report of the Senate Committee on the Judiciary, which cautions that "the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances" ... [as] the "committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one or the other exceptions contained in Rules 803 and 804(b)."  7 Graham, *Handbook of Evidence* at §807(1).  *See also, Mason v. Mitchell*, 293 F. Supp.2d 819, 826 (N.D. Ohio 2003) ("'[T]he essence of Rule 807 is ... that the rule should be used only in 'extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice.'") (citing *United States v. Harrison*, 296 F.3d 994, 1004 (10th Cir. 2002) (quoting *United States v. Farley*, 992 F.2d 1122, 1126 (10th Cir. 1993) (referring to Rule 803(24))).

While Rule 807 is not a panacea for the admission of hearsay statements that

otherwise do not fall within the established hearsay exceptions of Rule 803 or 804, the rule nonetheless provides a means, albeit a limited one, for the admission of otherwise hearsay statements that meet five criteria, including the requirement of prior notice under subsection (b) of the rule.  First, and perhaps foremost, is the requirement under the rule that the extra-judicial statement to be offered at trial has "equivalent circumstantial guarantees of trustworthiness." Fed.R.Evid. 807(a)(1).  In other words, the circumstances that surround the making of the out-of-court statement must render the declarant particularly worthy of belief.  *See gen., Idaho v. Wright*, 497 U.S. 805, 819 (1990).

Courts must look to the totality of the circumstances to determine the existence of independent indicia of reliability.  *See, United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995); *United States v. Barlow*, 693 F.2d 954, 961-63 (6th Cir. 1982), *cert. denied*, 461 U.S. 945 (1983). Included among the factors to be considered are: (1) the relationship of the declarant with the defendant(s) and the Government; (2) the motive of the declarant to make the extra-judicial statement; (3) the extent to which such statement reflects the personal knowledge of the declarant; (4) the past history of the declarant's statements, whether they are consistent or contradictory; (5) whether separate evidence beyond the declarant's extra-judicial statements corroborates the contents of such statements.  *United States v. Darwich*, 337 F.3d 645, 658-60 (6th Cir. 2003) (citing *Barlow*, 693 F.2d at 962).

Other factors that various courts and legal authority include in this analysis are the certainty of the declarant at the time the challenged statement was made, the passage of time between the out-of-court statement and the facts asserted therein, whether the statement was made in response to suggestive questions, and any partiality of the declarant.  7 Graham,

47

*Handbook of Federal Evidence*, at §807:1 nn.13-16 (collecting cases).  As one court has phrased the matter, the circumstantial guarantees of trustworthiness must be so evident that adversarial testing by cross-examination would add little to the reliability of the challenged statement. *United States v. Anderson*, 166 F.3d 1215 at *8 (6th Cir. 1998) (unpublished disposition), *cert. denied*, 526 U.S. 1032 (1999) (citing *Canan*, 48 F.3d at 961 ("The evidence admitted under Rule 807 must have an independent indicia of reliability; specifically, the challenged evidence must be 'so trustworthy that adversarial testing would add little to its reliability.'").

      The second requirement for admission pursuant to FRE 807 is that the extra-judicial statement be offered as "evidence of a material fact."  Fed.R.Evid. 807(a)(2).  As this requirement has been explained, not only must the statement be offered as evidence of a fact that is relevant under Rule 401, but it must be offered on a fact that is "of substantial importance in determining the outcome of the litigation."  7 Graham, *Handbook of Federal Evidence* at §807:1 n.18 (citing *United States v. Gaitin Acevedo*, 148 F.3d 577, 589 (6th Cir. 1988), *cert. denied*, 525 U.S. 912 (1998) ("Without addressing each requirement concerning the admissibility of hearsay evidence under the catchall exception, the letter is inadmissible because it was not 'offered as evidence of a material fact' as contemplated by Rule 804(b)(5)(A)" [former rule]); *Canan*, 48 F.3d at 959).  Obviously, a statement offered to establish an element of the charged offense against a particular defendant would fall readily within the concept of a material fact under the rule.

      The third requirement of FRE 807 is that the out-of-court statement be more probative on the point for which it is offered than any other evidence that could be obtained by the proponent through reasonable efforts.  FRE 807(a)(3).  To satisfy this requirement, the

Government must explain what, if any, reasonable efforts were exerted to secure the equivalent testimony from other admissible sources. *Darwich*, 337 F.3d at 660. *See also, United States v. Scrima*, 819 F.2d 996, 1001 (11th Cir. 1987)( former Rule 803(24) not applicable when the movant failed to show that reasonable efforts could not have produced a witness with personal knowledge); *United States v. Ball*, 547 F.Supp. 929 (E.D. Tenn. 1981) (evidence will have probative value if it tends to prove an issue in dispute). What may or may not be a reasonable effort to obtain evidence is entirely dependent upon the nature of the fact(s) at issue in light of their relationship to the entire litigation. 7 Graham, *Handbook of Federal Evidence* at §807:1 n.19. *See gen.,* 4 Weinstein's Evidence, ¶803(24)[01] at 803-437 to 803-849 (1994) ("What is 'a reasonable' [effort] depends upon such matters as the importance of the evidence, the means at the command of the proponent and the amount in controversy.").

The fourth requirement of the rule, found at FRE 807(a)(4) is that the admission of the out-of-court statement will best serve the purposes of the rules of evidence and the interest of justice. Fed. R. Evid. 807(a)(4). This requirement is considered to be largely a restatement of Rule 102, "and as such is of little practical importance in determining admissiblity." 7 Graham, *Handbook of Federal Evidence*, §807:1. Rule 102, in turn, seeks to "promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." Fed. R. Evid. 102. This language suggests to the Court that at the foundation of Rule 807, among the other factors, is a requirement for fundamental fairness when the admission of extra-judicial statements is considered pursuant to the residual hearsay exception of FRE 807. If the use of the rule to admit an otherwise inadmissible hearsay statement implicates the fairness of the trial, so as to potentially call into question the accuracy of the jury's verdict, then this requirement of

49

FRE 807 weighs against admission.

   The final requirement under subsection (b) of FRE 807 is that the party against whom the statement is sought to be admitted under the rule must be given reasonable notice of the proponent's intention before trial so as to allow adequate time for a response in opposition. Here, this fifth and final requirement of Rule 807 is not at issue.  The Government filed its initial motion to admit recorded jail/prison phone calls on June 14, 2011 (DN 36), over a year ago.  Its motion to supplement the original motion was filed in August of 2011 (DN 46).  Both Defendants responded to these two initial motions by the Government (DN 53, 54, 55).  The United States filed a reply (DN 58) and an addendum thereto (DN 60).  The Government and the parties also filed supplemental briefs at the request of the Magistrate Judge (DN 67, 76, 77). Accordingly, no question exists that adequate notice has been given.  The fifth requirement of FRE 807 is not in dispute.

   A final matter also must be considered when a court addresses the admission of evidence under FRE 807.  The constitutional requirements of the confrontation clause must be addressed as well.  *United States v. Jamieson*, 427 F.3d 394, 411 (6th Cir. 2005), *cert. denied*, 547 U.S. 1218 (2006) (citing *Darwich*, 337 F.3d at 659).  As noted earlier in this report, given the abandonment of *Ohio v. Roberts*, 448 U.S. 56 (1980) by the Supreme Court with its 2004 decision in *Crawford*, 541 U.S. at 59, we must seek to determine whether the out-of-court statement under review is testimonial hearsay and if so, whether the party against whom such testimonial hearsay is offered had the prior opportunity to cross-examine the declarant.  *United States v. Gabrion*, 648 F.3d 307, 339-40 (6th Cir. 2011) ("Under the Confrontation Clause of the United States Constitution, testimonial, out-of-court statements offered against the accused to

50

establish the truth of the matter asserted may be admitted only where (1) the declarant is

unavailable and (2) where the defendant has had prior opportunity to cross-examine the

declarant.") (citing *Crawford*, 541 U.S. at 68).

Although *Crawford* did not "spell out a comprehensive definition of

'testimonial,'" the court did indicate that a person who makes a casual remark to an acquaintance

does not bear testimony. *Crawford*, 541 U.S. at 68.[16]  Here, as previously noted, the *Cromer*

standard applies in the Sixth Circuit with the Court asking whether the declarant intended by his

or her statement to give information that a reasonable person would know would be used later at

trial.  *See, United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

The Magistrate Judge continues to conclude that none of the recorded jailhouse

telephone conversations is testimonial given the casual, offhand nature of the informal

conversation between close associates.  *See, Johnson*, 440 F.3d at 443 (unwitting declarant's

secretly recorded statements to close friend were non-testimonial); *Mooneyham*, 473 F.3d at 286-

87 (co-defendant's out-of-court statements to an undercover officer whose status was unknown

were non-testimonial); *United States v. Watson*, 525 F.3d, 583, 589 (7th Cir. 2008) ("A statement

---

[16]  The Supreme Court returned to *Crawford* in the context of police interrogation in *Davis v. Washington*, 547 U.S. 813 (2006).  The present case, however, involves no statements obtained by police interrogation.  More recently, in *Melendez-Diaz v. Massaschusetts*, __U.S.__, S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2008), the Supreme Court considered whether a drug-analysis certificate could be considered testimonial for the purpose of the confrontation clause. Once again, no question regarding the admissibility of such certificates is found in the present case.  The most recent confrontation clause case *Williams v. Illinois,* ___ U.S.___, 132 S. Ct. 2221 (2012) involves the admission of expert testimony based on the test results of a male DNA profile found in semen from the vaginal swabs of a rape victim, which the Court determined was not testimonial in nature given the primary purpose of the DNA test was to catch a dangerous rapist, not obtain evidence for use against the defendant. The present case, as previously noted, does not implicate *Williams*.

unwittingly made to a confidential informant and recorded by the Government is not

'testimonial' for Confrontation Clause purposes."); *United States v. Hendricks*, 395 F.3d 173,

182 n.9 (3rd Cir. 2005) (same); *United States v. Saget*, 377 F.3d 223, 229 (2nd Cir. 2004) (same).

Accordingly, at the outset of our analysis, we conclude that none of the out-of-court statements

sought to be introduced by way of Rule 807 implicates the Confrontation Clause given their non-

testimonial nature.


**Exhibit 1**

The first recorded phone call that the Government seeks to introduce via Rule 807

is a call made on Jan. 17, 2010, from GRCC by Ricky Kelly to Ladasha Downs[17].  During this

phone call, Downs asked Kelly who is "Jimbo or Jimmy?"  (DN 67 , Ex. 1, p. 1).  Kelly

responds, "My dude down in Atlanta."  (*Id*.).  The Government seeks to introduce this hearsay

conversation to establish that James Robinson is "Jimmy" an individual associated with Atlanta,

Georgia, who Kelly sufficiently trusts to permit him to safeguard Kelly's property.  The female,

Ladasha Downs, is a friend of Ricky Kelly's whom the Government maintains regularly

converses with him.

Due to their alleged longstanding friendship, the Government maintains that the

Court may safely assume that the statements of both individuals exhibit the equivalent of

---

[17] LaDasha Downs testified at the hearing held on April 9, 2012 that she has known
Ricky Kelly since 2005.  At one time, prior to his incarceration in 2006, she and Kelly did have a
romantic relationship. Now Kelly regularly calls her from prison.  The two are friends who talk
about their plans, children, the neighborhood, work and what they'd do when Kelly is released.
Downs is aware that the calls from Kelly were being recorded and could potentially be used in
court proceedings.

circumstantial guarantees of trustworthiness under required Rule 807. As support for this view, the Government cites several cases including *United States v. Tocco*, 200 F.3d 401, 415 (6th Cir. 2000), a case that discusses the requirement of particularized guarantees of trustworthiness in the context of Rule 804(b)(3). In *Tocco*, the court held that due to the familial relationship between the deceased declarant and the defendant, who were father and son members of a criminal organization, sufficient trustworthiness was established.

Here, of course, no such familial relationship exists to the Court's knowledge. At best, Kelly and Downs are friends. Whether this fact materially distinguishes *Tocco* is unresolved. The Court, however, need not determine the reach of *Tocco* at this juncture. This is so because two other considerations come to bear more directly in the resolution of the matter. These considerations are found in subsections (a)(2) and (a)(3) of FRE 807. In other words, materiality and probativeness are serious concerns that in the Court's mind call into question the application of Rule 807 to exhibit 1, designated "a."

First, ample other evidence may be found in Robinson's own statements to Kelly to establish that James Robinson is the "Jimmy" associated with Atlanta. Robinson repeatedly talks about Atlanta with Kelly, about his regret that Kelly did not take Robinson's advice and come to Atlanta with him. Kelly acknowledges that if he had done so he would be a rich man now. Therefore, little need exists for the Government to establish Robinson as Kelly's man in Atlanta through Downs' questioning given Robinson's own repeated statements and Kelly's responses thereto previously held to be admissible under Rule 801(d)(2)(A).

Second, an open question exists whether this information is material in the sense that it runs to an element of the charged offense, or speaks directly to Defendant Robinson's

guilt.  Certainly, the information falls within the broad scope of relevancy under Rule 401, but as

various commentators and courts strongly suggest, something more is required in this regard.

The hearsay information sought to be introduced through Rule 807 must be more than relevant; it

must be material.  Because the Government has offered exhibit 1 to establish the relationship

between Robinson and Kelly, and because such relationship is more than adequately established

by other evidence, and in any event does not run directly to Defendant Robinson's guilt, the

Magistrate Judge concludes that the applicability of Rule 807 to exhibit 1 is unavailing.  Exhibit

1 should be excluded at trial.


**Exhibit 3**

   The next jailhouse phone conversation sought to be admitted by the Government

under FRE 807 is a Jan. 26, 2010 call from GRCC by Ricky Kelly to Tonya Masden[18],

designated "c" by the parties.  During this call, Kelly refers to "my dude from Atlanta ... Jimmy"

when asking Tonya Masden to call Jimmy at a specific phone number to tell Jimmy how to put

money on his phone account so that Kelly may speak with him (DN 67, Ex. 3, pp. 1-2).  Once

again, the Government seeks to admit this particular conversation pursuant to FRE 807 in order

to establish the nature of the relationship between Robinson and Kelly as that relationship, in the

Government's view, provides the motive for Defendant Robinson to seek to obtain otherwise

---

[18] Tonya Masden also testified at the April 9, 2012 hearing about her relationship to Kelly.  Masden explained that she has known Kelly for approximately five years and the two are just friends who are not romantically involved. Masden agreed that Kelly has called her, although she can not remember on how many occasions. Basically, the calls were short, friendly, "how're you doin'" kind of calls according to Masden.  Masden was aware that the prison calls from Kelly were being recorded, but she really didn't give much thought about it.

confidential information involving the cooperation agreement of G.S. to testify against Kelly in his pending federal murder case.

Defendants primarily challenge the trust worthiness of this out-of-court statement. They seek to distinguish the nature of the relationship between Masden and Kelly from that of *Tocco* and the other cases cited by the Government.  The Court, for its part, sees the same obstacles to admission pursuant to FRE 807 as it did with exhibit 1.  The close nature of the relationship between Kelly and Robinson is more than adequately established by Defendant Robinson's own comments and Kelly's responses during the recorded conversations between the two men admitted pursuant to Rule 801(d)(2)(A).

Robinson during those conversations acknowledges that Kelly has been there for him since he was five years old and that he carries with him ongoing guilt about involving Kelly in an unstated activity that apparently had a detrimental result for Kelly.  Kelly, for his part, affirms the closeness of their friendship and tells Robinson that Robinson will be the first person that Kelly comes to see when Kelly gets out of prison.  As for the identification of Robinson as one of the callers, that is well established by other recorded jailhouse phone conversations.  In other words, the Court is not convinced that exhibit 3 is material (as opposed to merely relevant) and is the most probative evidence available. For these reasons, it should be excluded at trial.

**Exhibits 4 and 5.**

With exhibits 4 and 5, designated "d" by the parties, the Government seeks to introduce two excerpts of a phone conversation that occurred between Ricky Kelly and Defendant Robinson on Jan. 28, 2010, at 7:39 p.m.  The Government's purpose for the admission

of this recorded jailhouse phone call is to confirm that Robinson is holding property for Kelly
and that several unnamed individuals, including one "Gene" are attempting to discover what
property Robinson has of Kelly's.  The Government maintains that Kelly's responses to
Robinson's statements are substantively admissible under Rule 807.  As with exhibits 1 and 3,
the Government offers exhibits 4 and 5 to explain the nature of the relationship between
Defendant Robinson and Kelly in order to establish Robinson's motive to pass confidential
information to Kelly.

      The Court concludes that the jury should be permitted to hear Kelly's responses
in all of the recorded phone conversations that involve Defendant Robinson, which the Court
previously has determined are admissible against Robinson under Rule 801(d)(2)(A).  Kelly's
responses, apart from their substance, are essential in order that the jury members have any
possibility of understanding Robinson's statements.  To this extent, Kelly's responses in exhibits
4 and 5 are essential background that allows the jury to place Defendant Robinson's statements
in context.  *See, Deitz*, 577 F.3d at 683-84; *Davis*, 577 F.3d at 666-68; *Gibbs*, 506 F.3d at 486-
87.  The Government, however, desires to go beyond the admission of Kelly's statements for the
limited purpose of placing Defendant Robinson's extra-judicial statements in context.  It seeks to
introduce Kelly's statements in exhibits 4 and 5 substantively to prove that Kelly does have
hidden property that he has entrusted to Robinson.

      The Court considers this intended use of FRE 807 to be a far closer question than
that raised by the earlier exhibits discussed above.  Kelly is the only individual who knows the
full extent of his property, much of which apparently is hidden.  Robinson and Kelly are lifelong
friends speaking informally about current matters from personal knowledge.  No motive to

fabricate exists as this is not a post-arrest situation in which one individual is speaking with a known member of law enforcement with the hopes of exonerating himself or otherwise shifting blame.  No suggestion can be found that Kelly has a motive to fabricate statements in the conversation involving his property.  Because the conversation is recorded, and the parties can review the transcripts for accuracy, no serious question can be raised as to whether the conversation contained in exhibits 4 and 5 actually occurred.  None of the other conversations contradict Kelly's statements regarding his property or the efforts of others to obtain it by contacting Robinson.

Materiality is potentially a stumbling block to the extent that the term is limited to elements of the charged offense or is required to run directly to Robinson's guilt.  Once again, mere relevance under Rule 401 is not sufficient.  While Kelly's responses may be admitted so that Robinson's otherwise admissible statements are placed in context to be understood by the jury, the Court does not believe that FRE 807, a narrow exception, will suffice to bring Kelly's responses substantively into evidence.  Based on all of the factors discussed above, the Court recommends the substantive exclusion of Kelly's recorded statements based upon the failure to satisfy the materiality requirement of Rule 807(a)(2).

**Exhibit 7**

Exhibit 7, designated "f," contains the transcript of the phone conversation from Ricky Kelly to Latasha Downs on Feb. 2, 2010, at 5:36 p.m. (DN 67, Ex. 7, pp. 1-2).  During the call, Kelly advises Downs that he has spoken to "my dude Jimmy."  Kelly then continues to tell Downs that a number of individuals are attempting to find out whether he has property hidden.

57

(*Id*. at 1).  One of these individuals, Gene, is fishing hard in an effort to locate Kelly's property. Kelly for himself, however, denies to Downs that he has any significant property.  Instead, Kelly claims to be "starving eating oodles and noodles.  I'm eating out of the trash can."  (DN 67, p. 2).  Along the same lines, he adds, "Man, I got zero ... zero."  (*Id*.).

   The Government continues its efforts to obtain admission of this conversation pursuant to FRE 807, arguing that it establishes the relationship of Kelly and Robinson and Kelly's entrustment of his property to Robinson as a motive for Robinson to provide Kelly with information concerning the confidential cooperation agreement of G.S.  Like the prior conversations discussed in this report under Rule 807, Kelly's statements concerning what property he may or may not own do not appear to be "material" within the narrow meaning of Rule 807(a)(2).

   Further, Robinson's statements to Latasha Downs on Feb. 2, 2010, directly contradict the very notion that he has substantial property secreted and under the control of Robinson.  To the contrary, Kelly repeatedly denies to Downs that he owns any substantial property.  Instead, he claims to be "eating out of the trash can" and "eating oodles and noodles." Both of these statements are contradictory to the Government's theory that the close friendship between Robinson and Kelly is expressed by Robinson's management of Kelly's property.  Here, Kelly would have the listener believe he has no such property.  This inconsistency calls into question the trustworthiness of this particular statement, which in any event does not appear to the Magistrate Judge to run to a material fact.  For these reasons, the Magistrate Judge also shall recommend that the Government's motion to admit exhibit 7 be denied, as well as the earlier mentioned exhibits sought to be admitted under Rule 807, all of which the Court has concluded

do not satisfy the strict requirements of the rule.

**Exhibits 8A and 8B.**

Exhibits 8A and 8B, designated "g" by the parties, are two excerpts of the telephone call by Ricky Kelly from GRCC to James Robinson on Feb. 8, 2010, at 5:42 p.m. (DN 67, Ex. 8A, 8B). Here, the Government's concern is those statements of Defendant Robinson that relate to his co-defendant, Thurman. The Government seeks to admit such statements against Thurman, rather than Robinson, pursuant to Rule 807. As earlier noted, Rule 801(d)(2)(A) may only be used by an opposing party to introduce a declarant's out-of-court statements against that declarant. Accordingly, Rule 801(d)(2)(A) could not be used to introduce those portions of exhibits 8A and 8B in which Robinson refers to the involvement of Thurman in obtaining information concerning G.S.'s confidential cooperation with the Government.

During the first excerpt, exhibit 8A, designated "g," Robinson advises Kelly that Robinson has someone looking at his case (DN 67, Ex. 8A, p. 1). He then immediately continues to explain that this individual is the older sister of Kalila Brown, someone Kelly knows, and is Robinson's girlfriend, as well as a lawyer (DN 67, Ex. 8, p. 2). Robinson advises Kelly that his girlfriend has already looked up his case, so that Kelly only needs to tell Robinson what exactly Kelly wants Robinson to do or to have his girlfriend do for him. (*Id.*).

The second excerpt of the same conversation contained in exhibit 8B, also designated "g," continues to identify Robinson's girlfriend as being Kalila's other sister, Shanion. Robinson advises Kelly that presumably Kalila (although she is not named) does not know that Shanion is helping Robinson with Kelly's case. (DN 67, Ex. 8B, p. 1). Robinson then

59

advises Kelly to "keep it under wraps ... so we can do what we got to do." (*Id.*).  The

Government maintains that Robinson's comments concerning Shanion Thurman's alleged

involvement in assisting Robinson with investigating Kelly's case is admissible against Thurman

under FRE 807.

       The Court is inclined to agree for the following reasons.  The most important

reason centers on the circumstantial guarantees of trustworthiness of this information.  James

Robinson and Shanion Thurman are involved in a close, romantic relationship.  They share the

same apartment in Louisville, and certainly are more than mere friends.  Further, facts outside

the conversation confirm that Shanion Thurman is in a position through her employment with

attorney Holmes to have access to confidential information such as the cooperation agreement

executed by G.S.  Within days of that same agreement being transmitted to Holmes' office on

April 2, 2010, the details of the agreement allegedly are made known to Kelly's brother, Terrell

Gray, by Robinson who soon thereafter relates specifically and correctly the essential elements

of the bargain between G.S. and the federal prosecutors.  Accordingly, the information provided

by Robinson most naturally would appear to come from Thurman, who has access to it and its

accuracy is confirmed by Robinson's own statements.

       Second, Robinson has absolutely no motive at this point to falsely advise Kelly

that Robinson is attempting to help him.  Just the opposite is true.  Robinson and Kelly are

lifelong friends, as shown by Robinson's statements during their recorded jailhouse

conversations.  Robinson is naturally biased in favor of Kelly, and obviously from his comments

is eager to do whatever he can to help his friend avoid being successfully prosecuted for murder,

as well as assist in obtaining the earliest release possible for him.

Robinson is not dealing with law enforcement officials and has not been arrested at this point. No inconsistencies are found in the statements concerning Shanion's involvement. His statements are consistent throughout-- that Thurman, his girlfriend, has looked up Kelly's case and is assisting him in his efforts to help Kelly.  Accordingly, all of these factors would seem to the Court to fall far closer to *Tocco* and the other cases cited by the Government involving close relationships to establish equivalent circumstantial guarantees of trustworthiness. Additionally, the information concerning Thurman's efforts is obviously material as it runs directly to her criminal liability. No other source of information would appear to be more probative to the Court on this point. For these reasons, exhibits 8A and 8B would seem to the Court to fall within the narrow scope of FRE 807 as far as their admission against Shanion Thurman at trial.  No Confrontation Clause issues exist for the reasons set forth above.


**Exhibit 9**

With exhibit 9, designated "h," the Government seeks to introduce at trial statements made by Terrell Gray to Ricky Kelly during a conversation between the two brothers on April 11, 2010, at 7:48 p.m. (DN 67, Ex. 9).  Terrell Gray asked Kelly if he has talked to Jim. (*Id*. at 1).  Following Kelly's response, Gray advises Kelly that Jim has just "hit me with some bullshit rap." (*Id*.).  Gray then proceeds to tell Kelly that there is an individual, Little G, who is "running it." (*Id*. at 2). Gray explains that Little G is supposed to have sat down with the feds or the homicide people.  (*Id*. at 3).  Kelly denies that Little G can tell them anything about him.

The Government seeks to introduce this conversation to establish the truth of the statements - - that Robinson has advised Terrell Gray that G.S., a/k/a "Little G" has cooperated

with federal law enforcement officials to provide information against Kelly.  Once again, the Defendants insist that this out-of-court exchange lacks the equivalent circumstantial guarantees of trustworthiness to be admissible at trial.  The Court nevertheless concludes otherwise based on an examination of all the factors that surround the conversation.

Terrell Gray is the biological brother of Ricky Kelly.  The two have a familial relationship similar to that of the declarants in *Tocco*.  Additionally, neither man has any motive to fabricate their statements which are made during an informal conversation.  Each man also would normally be biased in favor of the other and would seek to help each other, rather than to mislead one another.  The information provided concerning Little G's cooperation is also confirmed by the same external facts mentioned above involving Shanion Thurman's employment at the Oldham County Public Defender's office where Kate Holmes works, the attorney assisting G.S.

Additionally, Robinson in a subsequent conversation with Kelly relates that he initially passed information concerning Little G's cooperation to Kelly's brother, a fact that confirms the accuracy of these statements in the conversation.  Certainly, the contents of this conversation, in contrast to some of the other ones earlier discussed, are material and run directly to the charged offense of witness tampering against Thurman and Robinson.  Neither individual recants his statements to the other and Terrell Gray's statements come directly from his conversation with Robinson, another individual highly motivated to assist Kelly.  More probative evidence than the statement contained in exhibit 9 is not reasonably attainable as the case is currently presented.  Accordingly, the Court recommends that the extra-judicial statements of exhibit 9 be admitted at trial pursuant to FRE 807.

**Exhibit 13**

The final exhibit that the Government seeks to introduce into evidence pursuant to FRE 807 is exhibit 13, designated "l" by the parties.  The exhibit contains a phone conversation from GRCC by Ricky Kelly to Kalila Brooks,[19] the sister of Shanion Thurman, on April 13, 2010, at 6:30 p.m.   In this conversation, Brooks initially tells Kelly that "your dude is talking to my sister ... this is my older sister."  (DN 67, Ex. 13, p. 1).  She then continues to explain to Kelly that her older sister is not as close to her as her younger sister, Sam (*Id.*).  Brooks continues to state that she only trusts her older sister to a certain extent.  (*Id.*).  Brooks then continues to speculate that something is not right with her older sister's relationship with James Robinson.  Kelly responds that there is nothing wrong with it and that her older sister, who is married to someone else, pursued Robinson (*Id.* at 1-2).  Kelly then tells Kalila that her older sister is a "smart intelligent woman.... who has looked out for [Kelly] as far as information wise...."  (*Id.* at 2).  Kelly adds that Kalila's older sister has kept him "in check" with "the latest information" about someone who is talking.  Brooks interrupts Kelly to advise him that she already knows (*Id.* at 2).

The question now is whether Kelly's hearsay statements during the recorded

---

[19] Kalila Brooks is the third witness who testified during the hearing of April 9, 2012. She is the younger sister of Defendant Shanion Thurman and has known Ricky Kelly since she was 18 years old.  The two did have a romantic relationship at one time.  Brooks testified that Kelly regularly called her from prison until a year ago and that most of her telephone conversations with Kelly were limited to friendly banter between two long-term friends. Kalila denied any knowledge of G.S. being a witness against Kelly or any threats against G.S. by Kelly.  Brooks was aware of the recorded warning at the start of each prison phone call, and that the call might be used in the future, although she didn't know if it would be in court.

phone call may be introduced by the Government through the vehicle of the residual hearsay exception.  Once again, the Government must satisfy the four requirements of FRE 807(a) in order to succeed in its motion to admit the statement.  Success in this respect seems unlikely to the Court for several reasons.  First, Kelly's statements, accepted at face value, run only to his mental state - - his awareness that Kalila Brooks' older sister, Defendant Shanion Thurman, is supposedly looking out for his interests.  Kelly's knowledge, while arguably relevant, cannot be considered to be "material" under Rule 807(a)(2).

Second, the conversation can hardly be characterized as being more probative on Defendant Thurmans' alleged involvement than the other exchanges in which Defendant Robinson indirectly identifies Shanion as being the individual who has provided him with information concerning the confidential cooperation agreement between G.S. and the federal and state law enforcement officials.  In other words, it does not appear that exhibit 13, designated " l," satisfies the requirements of Rule 807(a)(3).  Finally, the Court notes that some question exists concerning the equivalent circumstantial guarantees of trustworthiness.

Kalila Brooks candidly admits in her statement to Kelly that she is not close to her older sister, Shanion, whom she admits that she does not trust (DN 67, Ex. 13, p. 1). Likewise, no endearing familial relationship exists between Kelly and Brooks, either.  At most, Brooks is merely another individual that Kelly regularly talks to from jail.  This type of casual relationship would not seem to be what *Tocco* and the other decisions cited by the Government envision.  For these reasons, the motion of the Government to admit exhibit 13 pursuant to Rule 807 should be denied.

D.      **Statement Against Interest Under Rule 804(b)(3)**

        The Government in the final portion of its supplemental memorandum addresses two hearsay statements that it seeks to admit against Defendant Shanion Thurman pursuant to Rule 804(b)(3).[20]  The first of the statements is found in exhibit 12, designated "k" by the parties. This exhibit contains a recorded conversation between Kelly and Defendant Robinson on April 12, 2010, at 11:52 a.m.  (DN 67, Ex. 12).  During the conversation, Robinson discusses events involving G.S., whom Robinson advises Kelly was severely beaten several days earlier after the "paper thing went down about a month ago...." (*Id.* at 2).  Robinson then continues to advise Kelly that G.S. claims Kelly has killed three individuals, "knocked three pins down...."  (*Id.*)

---

    [20]  Rule 804(b)(3) provides:

        (b)  **The Exceptions:**  The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
....
            (3) **Statement Against Interest.**  A statement that:
                (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest and had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
                (B) is supported by corroborating circumstances that clearly indicate its trustworthiness if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed.R.Evid. 804(b)(3).

Robinson also tells Kelly that there are two other allegedly cooperating individuals who also will state that Kelly was involved in ten murders, or "ten pins altogether...." (*Id.*).  Robinson then continues in effect to tell Kelly that he has no information about the other two individuals, stating:

> Robinson:  Yeah, but she didn't give me information on the other two 'cause she wasn't really supposed to give me the information on that.  You dig?
>
> Kelly:  Right.
>
> Robinson:  But she knows you, my nigger, so you know.

(DN 67, Ex. 13, p. 2).

The second item that the Government seeks to introduce into evidence at trial pursuant to FRE 804(b)(3) is a portion of the anticipated testimony of jailhouse informant C.S.1, whose anticipated testimony is summarized on pp. 8 and 9 of the Government's supplemental motion (DN 67, pp. 8-9).  The conversation between Defendant Robinson and C.S. 1, as earlier noted, occurred in the Louisville Metro Corrections facility following Robinson's arrest in August of 2010.  According to the Government, Robinson recognized C.S.1 as a "friend of a friend" and proceeded to confide in him, essentially all of the material details of both his and Thurman's involvement in providing otherwise confidential information to Kelly by improperly obtaining the confidential cooperation agreement of G.S.

Specifically, the Government claims now that Robinson told C.S.1 that he was involved with a female lawyer associated with the Federal Defender's office who had access to secret information about an individual, "Little G," who was cooperating with the police to provide information implicating Kelly in several murders.  Robinson allegedly told C.S.1 that his

girlfriend, whom he apparently did not name during the conversation, gave the information concerning Little G's cooperation to Robinson, who then conveyed it to Terrell Gray and Ricky Kelly.

   The Government argues in support of admission of these two items that (1) Robinson is an unavailable witness due to the substantial likelihood he will assert his Fifth Amendment privilege at trial, (2) that the above-recited statements of Robinson are truly adverse to his penal interests, and (3) corroborating circumstances exist to establish the trustworthiness of the April 12, 2010 statements to Kelly and the August statements to C.S.1 concerning Thurman's involvement.

   Defendants respond that no proof of trustworthiness or reliability whatsoever exists concerning Robinson's statements to C.S.1.  Aside from the incredibly convenient nature of C.S. 1's testimony, Defendants maintain that the Government is simply attempting to use hearsay statements made to C.S.1 in an attempt to corroborate hearsay statements made during the recorded jailhouse phone conversations, and vice versa.  Further, Defendants in keeping with their prior position, maintain that the unavailability of the Defendants, Kelly, and the other individuals with whom Kelly spoke, has not been established by the Government and therefore any ruling at this time simply is premature.  Defendants next argue that no particularized guarantees of trustworthiness whatsoever exists, outside the Government's bald assertions.  In fact, Defendants claim that the nature of Robinson's statements implicating his co-defendant is exactly the type of situation that the Supreme Court condemned in *Lily v. Virginia*, 527 U.S. 116, 134 (1999).

   In considering these arguments, the Court turns first to the requirements of FRE

804(b)(3) for the admission of statements against interest.  Sixth Circuit case law repeatedly explains that three essential requirements must be met in order for an extra-judicial statement to be admitted at trial pursuant to Rule 804(b)(3).  *See, United States v. Johnson*, 58 F.3d 320, 326 (6th Cir. 2009), *cert. denied*, __U.S. __, 130 S.Ct. 3409, 177 L.Ed.2d 326 (2010); *United States v. Tocco*, 200 F.3d at 414; *United States v. Franklin*, 415 F.3d 537, 545-48 (6th Cir. 2005); *United States v. Alvarez*, 266 F.3d 587, 593 (6th Cir. 2001), *cert. denied*; *Gonzales-Garcia v. United States*, 535 U.S. 1098 (2002); *Maliscewski*, 161 F.3d at 992.

First, the declarant must be unavailable to testify at trial.  *Johnson*, 581 F.3d at 326-27.  In those situations in which the court reasonably anticipates that a defendant or defendants will assert the privilege against self-incrimination, it may reasonably be presumed that the declarant is unavailable until circumstances establish otherwise.  *Id*.  Second, the out-of-court statement to be admitted must be adverse to the pecuniary or penal interest of the declarant from the prospective of an average, reasonable person.  *Tocco*, 200 F.3d at 414.  *See also, Williamson v. United States*, 512 U.S. 594, 603-04 (1994) (discussing the requirements for admission of evidence under Rule 804(b)(3)).  Third and finally, corroborating circumstances must truly establish the trustworthiness of the statement.  *Williamson*, 512 U.S. at 603-04.

This third prong of FRE 804(b)(3) requires the Court to focus not "on whether other evidence in the case corroborates what the statement asserts, but rather on whether there are corroborating circumstances which clearly indicate the trust worthiness of the statement itself."  *United States v. Franklin*, 415 F.3d 537, 547 (6th Cir. 2005).  While this standard is considered to be similar to the former Sixth Amendment standard of *Ohio v. Roberts*, 448 U.S. at 65,  *Roberts* and its standard of "particularized guarantees of trustworthiness" has been swept

away by *Crawford* and *Davis*.  *Johnson*, 581 F.3d at 327.

   The statement to be admitted under the rule need not be a direct confession of

guilt in order to be sufficiently inculpatory.  *See, United States v. Barrett*, 539 F.2d 244, 251 (1st

Cir. 1976) ("We do not understand the hearsay exception to be limited to direct confessions.").

Further, as the U.S. Supreme Court explained in *Williamson*:

> Whether a statement is in fact against interest must be determined
> from the circumstances of each case.  Thus, a statement admitting
> the guilt and implicating another person, while in custody, may
> well be motivated by a desire to curry favor with the authorities
> and hence fails to qualify as against interest....  On the other hand,
> the same words spoken under different circumstance, e.g., to an
> acquaintance, would have no difficulty in qualifying....

512 U.S. at 601-02.

   To determine that corroborating circumstances do truly establish the

trustworthiness of the challenged statement, the Court must look to the totality of the

circumstances that clearly establish the trustworthiness of the statement itself.  *Franklin*, 415

F.3d at 447 ("[T]he court is not to focus on whether other evidence in the case corroborates what

the statement asserts, but rather on whether there are 'corroborating circumstances which clearly

indicate the trustworthiness of the statement itself.'") (citing *United States v. Price*, 134 F.3d 34,

348 (6th Cir.), *cert. denied*, 525 U.S. 845 (1998).  *See also, Alvarez*, 266 F.3d at 592.  Finally,

merely because an out-of-court statement that implicates the declarant also happens to inculpate

others does not render the statement inadmissible under Rule 804(b)(3) so long as the three

requirements of the rule are satisfied.  *Tocco*, 200 F.3d at 414-16.

   The Court now turns to each of the two statements that the Government seeks to

introduce pursuant to  Rule 804(b)(3).  The first to be considered in the April 12, 2010 phone

conversation between Defendant Robinson and Ricky Kelly wherein Robinson mentions that his girlfriend has provided him with information about the cooperation of G.S. with law enforcement officials that she really wasn't supposed to give Robinson (DN 67, Ex. 12, p. 2)(designated "k"). The Court has assumed for the purpose of analysis that Defendant Robinson will elect to assert his Fifth Amendment right at trial and decline to testify.  Accordingly, he would be unavailable under those  circumstances.

   The statement of Robinson in its entirety, as well as that portion that appears to refer to Defendant Thurman is sufficiently inculpatory of Robinson such that the average reasonable person would conclude that the statement is directly adverse to Robinson's penal interest, as well as that of Thurman.  Robinson in the statement acknowledges that he has obtained information from his girlfriend that she should not have shared with him.  He then proceeds to relate that information to Kelly including the exact details of what G.S.'s anticipated testimony would be, as well as the benefits to be received by G.S. in return for his cooperation - - home incarceration and visitation with his daughter (DN 67, Ex. 12, p. 6).  This disclosure runs to the heart of the Government's charges against both Robinson and Thurman.  Accordingly, the second prong of FRE 804(b)(3) likewise is met as to exhibit 12.

   The final requirement of corroborating circumstances that truly established the trustworthiness of the statement is the element of the Rule most disputed by the parties. Nevertheless, the Court finds that when one looks to all of the circumstances surrounding the statement, its trustworthiness is readily established.  The statement occurred during a phone conversation between very close, lifelong friends.  This situation stands in stark contrast to those situations that involve post-arrest, custodial interrogation of a suspect by police, such as that in

*Lily v. Virginia*, 527 U.S. 116 (1999) (admission of custodial statements to law enforcement personnel made against penal interest that incriminated another person ordinarily will be found to have violated the confrontation clause when admitted against such person in a criminal case as such evidence in presumptively unreliable).

Robinson was not in custody, or under interrogation, during the recorded phone conversation of April 12.  Further, he had no motive to attempt to exonerate himself while inculpating Thurman, a factor that runs against trustworthiness.  The statement was recorded so that no risk exists that it will be inaccurately related to the jury, which will have the opportunity to listen to the statement at trial if admitted.  Robinson was highly motivated to help Kelly so that he would naturally desire to be helpful by providing Kelly with accurate information about the details surrounding the cooperation of G.S., and the cooperation agreement itself, to include the involvement of his girlfriend, Shanion Thurman.  All of these factors weigh heavily in favor of the trustworthiness of Robinson's statement while simultaneously establishing the non-testimonial nature of the extrajudicial statement so as to remove any confrontation clause considerations under *Crawford*.  For all of these reasons, the Court concludes that exhibit 12 is substantively admissible at trial by way of FRE 804(b)(3) as to those portions that make reference to the involvement of Robinson's girlfriend, Defendant Thurman.

The final matter is the jailhouse conversation between Defendant Robinson and C.S. 1 that occurred in August of 2010, following Robinson's arrest.  Apparently, at this time C.S. 1 is anticipated to testify at trial and will be subject to cross-examination.  Robinson, however, as noted, will probably chose to assert his Fifth Amendment privilege and therefore will be unavailable.  The first requirement of Rule 804(b)(3) is met.

71

The second requirement, that the statement be inculpatory as determined by an average, reasonable person, also is satisfied.  Robinson allegedly sets forth in his conversation with C.S. 1 the entire details of his and his girlfriend's involvement, her employment at a defender's office, which gave her access to secret information about Little G, an individual cooperating with the police against Kelly, that she gave to Robinson, Kelly's friend, which he in turn provided to Kelly's brother and Kelly himself (DN 67, pp. 8-7).  Robinson further allegedly related to C.S. 1 that "they" had put a hit out on Little G as a result of learning about his cooperation and were definitely out to get him.  These alleged statements could hardly be more inculpatory and indeed border on an outright confession to the offense of attempted witness tampering.

The crux of the parties' dispute falls again on the third prong of Rule 804(b)(3) - - the existence of corroborating circumstances that clearly indicate the trustworthiness of the statement.  Here, matters are somewhat different from the previously recorded jailhouse conversations that occurred in the winter and spring of 2010.  Now, Robinson has been arrested and is in custody in the Louisville Metro Corrections facility. He is not speaking to his childhood and lifelong friend, Ricky Kelly.  He instead is speaking with, at best, a friend-of-a-friend.

Circumstances do not indicate from the face of the motion papers how long Robinson had been in jail at the point that his conversation with C.S. 1 occurred; nor do the motion papers reveal how long Robinson had interacted with C.S. 1, or the nature and degree of that interaction while the two men were housed in jail together.  It might well be that Robinson and C.S. 1 were daily companions in jail who became good friends, perhaps even cell mates who shared many activities in common while incarcerated.  *See, Johnson*, 581 F.3d 320 (6th Cir.

72

2009), *cert. denied,* __U.S.__, 130 S.Ct. 3409, 177 L.Ed.2d 326 (2010) (secretly recorded statements between cell mates who were friends in confidence, saw each other daily, engaged in numerous social activities together and worked together, satisfied the trustworthiness analysis of Rule 804(b)(3)).  Cf. *United States v. Ouedraogo*, __Fed. Supp.2d___, 2011 WL 6402191 (W.D. Mich. Dec. 21, 2011) (rejecting the outcome of *Johnson,* 581 F.3d at 327, where the declarant in *Ouedraogo* was not a cell mate of the defendant, although they were housed in the same institution, was not a close friend of the defendant, was an antagonist of the defendant, and had a motive to give false testimony in order to obtain beneficial treatment in his own criminal case).

Certainly, there are some corroborating circumstances that exist concerning Robinson's statement to C.S. 1.  The statement is remarkably similar, eerily so according to the Defendants, to Robinson's prior recorded phone statements to Ricky Kelly earlier in the year.  Further, Robinson did indeed have a girlfriend, Shanion Thurman, who worked as a legal assistance at a public defender's office in Oldham County where she did have access to the confidential cooperation agreement of G.S., an agreement later discovered in the glove compartment of her automobile following the execution of a search warrant.

Robinson did in an earlier conversation with Ricky Kelly correctly relate the essential aspects of that cooperation agreement, and apparently had passed along information concerning Sgt. Butler's letter of July 22, to Terrell Gray, Kelly's brother.  All of these circumstances, however, run to the accuracy of the extra-judicial statements made to C.S.1 in August of 2010, rather than to the trustworthiness of the statement itself.  The Court therefore on the whole must conclude that the circumstances directly surrounding the making of the statement to C.S. 1 by Robinson fall closer to the situation that existed in *Ouedraogo*, rather than those of

*Johnson.*

Absent further development of the nature of the relationship between Defendant Robinson and C.S. 1 that would corroborate the trustworthiness of the unrecorded statement, the Court must recommend that the statement made by Robinson to C.S. 1, as it relates to Defendant Thurman, does not satisfy the requirements of Rule 804(b)(3) so as to be admissible against her. *See gen., United States v. Salvador*, 820 F.2d 558, 561 (2nd Cir. 1987), *cert. denied*, 484 U.S. 966 (1987) ("Corroboration must 'clearly' indicate such trustworthiness. We take this to mean that the inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable. As Judge Campbell has pointed out, 'this is not an insignificant hurdle'.") (citing *United States v. Barrett*, 539 F.2d 244, 253 (1st Cir. 1976).

## RECOMMENDATION

For the reasons set forth above, the Magistrate Judge recommends that the motion and supplemental motion of the United States to admit certain recorded phone calls and statement be **GRANTED IN PART AND DENIED IN PART** as set forth above.

**<u>NOTICE</u>**

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Copies to Counsel of Record

TIC:  2/00